**Tina ANTOINE–TUBBS Plaintiff,**

v.

**LOCAL 513, AIR TRANSPORT DIVISION, TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, and American Airlines, Inc., Defendants.**

**No. CIV.A. 3:96–CV–0572–P.**

United States District Court,
N.D. Texas,
Dallas Division.

Sept. 22, 1998.

Donald Hill, Dallas, TX, for Plaintiff.

Sanford R. Denison, Dallas, TX, for Defendants.

### MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Before the court are:

1. Defendant American Airline's Motion for and Brief in Support of Summary Judgment, filed June 9, 1997:

2. Plaintiff's Memorandum Response to Defendant American Airline's Motion for Summary Judgment, filed July 7, 1997;

3. American's Reply to Plaintiff's Response to American's Motion for Summary Judgment, filed July 18, 1997;

4. American's Objections to Plaintiff's Evidence in Response to American's Motion for Summary Judgment, filed July 18, 1997;

5. Plaintiff's Motion for Leave to File Additional Affidavits in Response to Defendant American Airline's Motion for Summary Judgment and Brief in Support, filed July 14, 1997;

6. American's Opposition to Plaintiff's Motion for Leave to File Additional Affidavits in Response to American's Motion for Summary Judgment, filed July 16, 1997;

7. Plaintiff's reply to American's Opposition to Plaintiff's Motion for Leave to File Additional Affidavits, filed July 17, 1997;

8. American's Surreply to Plaintiff's Motion for Leave to File Additional Affidavits in Response to American's Motion for Summary Judgment, filed July 28, 1997;

9. American's Post–Hearing Brief in Response to Plaintiff's Motion for Leave to File Additional Affidavits, filed August, 18, 1997;

10. American's Supplemental Briefing in Support of its Motion for Summary Judgment, filed October 27, 1997;

11. Plaintiff's Supplemental Briefing in Opposition to Defendant, American Airline's Motion for Summary Judgment, filed October 30, 1997;

12. American's Reply to Plaintiff's Supplemental Briefing in Opposition to American's Motion for Summary Judgment, filed November 12, 1997;

13. Plaintiff's Motion for Sanctions including Striking Defendant's Reply to Plaintiff's Supplemental Brief filed November 13, 1997;

14. American's Response to Plaintiff's Motion for Sanctions filed November 26, 1997.

### BACKGROUND

Plaintiff, Tina Antoine–Tubbs ("Plaintiff" or "Tubbs"), filed this suit alleging employment discrimination and tort claims against Defendants, her union, Local 513, Air Transport Division, Transport Workers Union of America, AFL–CIO, and her employer, American Airlines, Inc. ("American"). By order of August 19, 1997, this court granted the union's motion for summary judgment with respect to two of plaintiff's claims, and plaintiff agreed to dismissal of the remaining claims against the union. Thus, the sole remaining defendant is American, and presently before the court is American's motion for summary judgment. Tubb's complaint against American alleges claims under Title VII of the Civil Rights Act of 1964, as amended in 1978 (the Pregnancy Discrimination Act), and as further amended in 1991, based on sex. Plaintiff alleges she was treated less favorably than similarly situated men employed by American and was subjected to a hostile work environment. Tubbs also sues for race discrimination under Title VII and under 42 U.S.C. § 1981. Tubbs

also alleges a complaint under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, and a complaint of intentional infliction of emotional distress under state common law.

## SUMMARY JUDGMENT STANDARD

Summary Judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence and the inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. [cite]. The party defending against a motion for summary judgment cannot defeat the motion unless he provides specific facts that show the case presents a genuine issue of material fact, such that a jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Anderson*, 477 U.S. at 248–50, 106 S.Ct. 2505; *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir.1993). In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996)(en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he bears the burden of proof at trial, summary judgment must be granted. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

Finally, the court has no duty to search the record for triable issues. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 403 (6th Cir.1992). The court need only rely on the portions of the submitted documents to which the nonmoving party directs the court. *Id.*

## DISCUSSION

Tubbs began working for American on April 8, 1985. In late 1993, Tubbs discovered she was pregnant. At the time of her pregnancy, Tubbs held the position of a ground operations agent. In January 1994, plaintiff informed her supervisors of her pregnancy and of her doctor's instructions to not lift anything over ten (10) pounds. In May 1994, Tubbs requested lighter work duty due to her pregnancy. Tubbs alleges that she was told by supervisory personnel that in order to retain her position with American, she needed to be able to lift twenty-five (25) pounds of weight.

On Wednesday, May 18, 1994, plaintiff went to see her physician, Dr. Rhodesia LaStrap. While at her doctors on May 18, plaintiff complained that she had been suffering from a headache for about two weeks and that she had been experiencing increased stress because of problems related to her sister. Tubbs' blood pressure was very high, 170/110, and protein was present in her urine. Because these symptoms are common symptoms of a pregnancy disorder called preeclampsia, Dr. LaStrap ordered Tubbs not to go to work and to stay on bed rest until at least May 23, 1994. Dr. LaStrap saw Tubbs on May 19 and 20. On May 19, Tubbs' blood pressure was 160/110 and 150/100, and on May 20 her blood pressure was 152/98. As of May 20, Dr. LaStrap had not reached a conclusion as to whether Tubbs could return to work. Dr. LaStrap's office notes indicate that on May 20 Tubbs was advised to continue on strict bed rest until she was evaluated again on Monday,

May 23, 1994. On Monday, May 23, 1994, contrary to her doctor's directions, Tubbs reported for work at 5:30 a.m. because she had exhausted her paid sick leave. Shortly after arriving at work, Tubbs was told she needed to report to the lost-time control office. Tubbs waited for the union stewards before proceeding to the lost-time control office at around 9:30 a.m. While at lost-time control, Kelly Parks, the losttime manager, and Tubbs had an argument. Tubbs alleges that Parks attacked her from the moment she walked in, told her he could send her home for being out of uniform, and shouted at her and used obscenities. Discussions followed as to whether Tubbs had previously submitted any medical restrictions to American, and whether Tubbs had to be cleared by American's medical department, because of her absences from work the previous week, before she could continue working. While in the lost-time office, Tubbs complained she was not feeling well and was taken to American's medical department. At the medical department, a nurse took Tubbs' blood pressure several times. The nurse then called Tubb's physician and informed her that Tubbs was at American's medical department, that Tubbs was very upset, had a severe headache, and her blood pressure on arrival had been 204/110, but had come down after ten minutes to 150/110. Tubbs was subsequently taken to her doctor's office where her blood pressure was 152/100. Tubbs was sent home and told to remain on bed rest and to return to her doctor's office the next day. On May 24, Tubbs' blood pressure was 160/102, which was reduced to 160/90 after resting on her left side. A urinalysis revealed protein in her urine at a level higher than the previous week. Tubbs denied headache, blurred vision, or abdominal pain at that time. Dr. LaStrap offered Tubbs the option of going to the hospital or going home and staying at bed rest until her appointment with a perinatologist the next day. Tubbs testified she went home from the doctor's office and took a nap. Tubbs awakened around 5:30 that afternoon, and around 6:00 o'clock began having severe back pain and started feeling the baby "balling up". Tubbs called her doctor around 10:00 p.m. and reported her symptoms. Tubbs was told to go directly to the hospital, and she reported to the hospital shortly after 10:00 p.m. on May 24. On arrival at the hospital, Tubbs' blood pressure was 211/106, and no heart beat was detected in the fetus. A cesarean section was performed at around 11:30 p.m., and the fetus was stillborn. The cause of death was placental abruption caused by severe preeclampsia. On an insurance claim submitted by Tubbs, Dr. LeStrap stated that the symptoms of preeclampsis first appeared on May 18, 1994. The condition of preeclampsia includes the presence of hypertension, or high blood pressure, in the mother. This results in insufficient blood supply to the fetus as well as to multiple organs of the mother. If left untreated, preeclampsia can result in death to the fetus and the mother. In this case, plaintiff's doctor determined that the preeclampsia led to placental abruption, or the premature tearing of the fetus from the placenta, which led to the death of the baby.

Plaintiff alleges that the incident between Tubbs and American employees at the lost-time office on May 23, 1994, caused her to develop the preeclampsia which led to the death of her baby. The May 23, incident is the basis of Tubb's claim for intentional infliction of emotional distress against American.

As a preliminary matter the court addresses American's objections to plaintiff's summary judgment evidence. The court overrules American's objections to the submission of plaintiff's EEOC complaint. The complaint states the date on which plaintiff filed her charge with the EEOC and contains the allegations of discrimination made by plaintiff to the EEOC. Since a plaintiff can not ordinarily pursue claims in court which were not presented to the EEOC, the EEOC complaint limits the scope of plaintiff's claims in court. Of

course, the allegations of discrimination made by plaintiff in her EEOC complaint are not considered for the truth of the matters asserted, but are considered for the fact that plaintiff did file an EEOC complaint and to determine the scope of plaintiff's claims before this court. American's objection to the medical records of Dr. LeStrap is overruled. The remaining objections address specific statements of various individuals and will be addressed only if the court relies on those statements in resolving the present motion for summary judgment.

■ Additionally, plaintiff has filed a motion to file additional affidavits with her response to the defendant's motion for summary judgment. American objects on the basis that plaintiff never identified the witnesses as persons with relevant knowledge in response to the defendant's discovery requests and in accordance with the mandatory disclosure provisions of Rule 26(a), Fed. R. Civ. Proc. American argues it would be unfair to have to defend against the testimony of witnesses who were identified only after the close of discovery. Plaintiff responds that she is entitled to supplement her summary judgment response with affidavits pursuant to Federal Rule of Civil Procedure 56(e). Plaintiff, however, overlooks that persons with relevant knowledge have to be identified in response to proper discovery requests and that discovery cannot ordinarily take place after the discovery deadline in the court's Scheduling Order. Plaintiff also overlooks that Rule 37(c)(1) provides that witnesses not properly disclosed should not be permitted to testify at trial or in connection with any motion. Plaintiff has not shown good cause or substantial justification for her failure to disclose these witnesses prior to the close of discovery. Hence, plaintiff's Motion for Leave to File Additional Affidavits in Response to Defendant American Airlines' Motion for Summary Judgment is denied.

### A. Plaintiff's Intentional Infliction of Emotional Distress Claim

■ The elements of an intentional infliction of emotional distress claim are: (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the emotional distress suffered by plaintiff was severe. *Ward v. Bechtel Corp.*, 102 F.3d 199, 203 (5th Cir. 1997). A defendant's conduct is "extreme and outrageous" when it surpasses "all bounds of decency, such that it is utterly intolerable in a civilized community .... Liability does not extend to mere insults, indignities, threats, annoyances, or petty oppressions." *Id.* at 203 (internal citations omitted).

Tubbs asserts that Parks' conduct toward her at the lost-time office on May 23, 1994, which resulted in plaintiff losing her child, constitutes extreme and outrageous behavior which caused her severe emotional distress. In support of her claim that Parks' conduct caused her to lose her child, Tubbs offers the testimony of her physician, Dr. LeStrap. Dr. LeStrap testified that the incident in the lost-time office on May 23, 1994, was a contributing factor leading to Tubbs' development of preeclampsia which resulted in Tubbs' miscarriage. American responds that Dr. LeStrap's testimony is not admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Further, American contends that even if Dr. LeStrap's testimony is admitted, the summary judgment evidence establishes that Tubbs' preexisting condition of preeclampsia caused the miscarriage. The court agrees with American and finds that Dr. LeStrap's testimony is not admissible under the teachings of *Daubert* and subsequent Fifth Circuit cases.

In seeking the admission of Dr. LeStrap's testimony, plaintiff relies on the Fifth Circuit case of *Moore v. Ashland Chemical, Inc.*, 126 F.3d 679 (5th Cir.

1997). In *Moore*, a divided panel of the Fifth Circuit distinguished between testing the admissibility of evidence relating to the "hard sciences" and evidence pertaining to the practice of clinical medicine. The panel concluded that what are commonly referred to as the *Daubert* factors are "hard scientific methods" more appropriately applied to the hard sciences and "generally are not appropriate for assessing the relevance and reliability of clinical medical testimony. Instead, the trial court as gatekeeper should determine whether the doctor's proposed testimony as a clinical physician is soundly grounded in the principles and methodology of his field of clinical medicine." *Id.* at 689–90. The majority went on to identify seven factors which it held demonstrated that the opinion of the proffered expert was soundly grounded in traditional clinical medical knowledge. Those factors are: (1) personal examination of the plaintiff by the doctor; (2) personally taking a detailed medical history from the plaintiff; (3) using differential diagnosis and etiology; (4) reviewing tests, reports and opinions of other doctors; (5) reviewing other facts or data reasonably relied on by medical experts in forming opinions or inferences as to medical causation; (6) reference to medical literature; and (7) utilizing the doctor's training and experience.

█ In this case, the court finds that applying the factors and standard utilized in *Moore* or applying the standard and factors announced in *Daubert* leads to the same result. That is, the courts finds that Dr. LeStrap's testimony, with respect to the cause of plaintiff developing preeclampsia, is not soundly grounded in traditional clinical medical knowledge. At the time of the miscarriage, Dr. LeStrap had been a practicing doctor of osteopathy for less than two years, had been involved with only one prior case of preeclampsia

while in her residency program, and had not seen a case of preeclampsia in her own practice. Further, Dr. LeStrap acknowledged that she has not seen any medical literature or studies concluding that work related stress causes preeclampsia. As with other illnesses, there are certain persons who are more at risk or predisposed to developing preeclampsia. Plaintiff had experienced problems with hypertension in a previous pregnancy and had a family history of hypertension. These factors make her more at risk for developing preeclampsia. As of May 18, 1994, plaintiff was indicating symptoms of preeclampsia in that she had high blood pressure and protein in the urine.[1] In *Moore*, a case involving exposure to chemicals, the proffered expert had 53 years of experience, reviewed the material data sheet prepared by the manufacturer which listed the dangers posed by the chemicals in issue, and reviewed other medical literature pertaining to the properties of the chemicals which caused the disease developed by the plaintiff. It was on the basis of this and the other factors enumerated in *Moore* that the expert reached his opinion as to causation. By contrast, Dr. LeStrap can point to no objective evidence, other than her own experience in this case, on which she relied in reaching her opinion. An opinion that is apparently not shared by others in this field of the medical profession. Nor has plaintiff pointed to any other doctor who has found that preeclampsia was caused by a single incident of stress in the work place. The most Dr. LeStrap can say is that plaintiff was subjected to stress at work on the morning of May 23. The stress led to high blood pressure which developed into preeclampsia. However, this ignores that plaintiff was under other stresses, as she explained to her doctor on May 18, and that she was

---

1. Unfortunately, plaintiff did not tell her doctor that she had experienced hypertension in a previous pregnancy so Dr. LeStrap was not aware of this risk factor. Personal examination of a plaintiff and a personal taking of a detailed medical history are factors used by the *Moore* court in testing the reliability of the expert's opinion. In this case, these factors weigh against reliability of Dr. LeStrap's opinion because plaintiff omitted a significant detail of her medical history.

previously showing symptoms of preeclampsia.[2] The high blood pressure and the protein in the urine which were present on May 18, continued until the miscarriage. Both on May 18 and on May 23, when plaintiff's blood pressure was in a range that caused concern to doctor, her blood pressure was brought down after a few minutes. When asked if she could state with reasonable medical probability what caused the preeclampsia in plaintiff, Dr. LeStrap replied, "You can't say that." In sum, this court finds that Dr. LeStrap's opinion as to the cause of preeclampsia in plaintiff is not supported by the medical knowledge in her field and amounts only to subjective belief and unsupported speculation.[3]

Plaintiff relies on *McCullock v. H.B. Fuller Company,* 61 F.3d 1038, 1043 (2nd Cir.1995) in support of the admissibility of Dr. LeStrap's testimony. In *McCullock,* the plaintiff was exposed to glue fumes while working for a company that bound and printed books. At trial, a physician testified that the plaintiff's exposure to the glue fumes caused throat polyps to develop in the plaintiff. On appeal, the defendant argued that the trial court erred in allowing the physician to testify as to causation. Among the defendant's arguments was that the doctor could not point to "a single piece of medical literature that says glue fumes cause throat polyps." The court of appeals rejected the defendant's arguments and held the admission of the doctor's testimony was proper. The court noted that the doctor had been practicing for nearly 30 years, had treated the plaintiff, reviewed the manufacturer's safety data sheets ("MSDS"), used differential etiology, and referred to various scientific and medical treatises. The manufacturer's MSDS warned that breathing the fumes and vapors should be avoided, that the fumes from the glue could cause irritation of the nose, throat, and respiratory tract, and encouraged use of the product in ventilated areas. The evidence was that plaintiff's work area was not ventilated. By contrast, in this case, Dr. LeStrap had been practicing less than two years when plaintiff miscarried, and approximately five years when she was deposed, there were no safety data sheets to review, and no medical studies, literature, treatises, or other practicing physicians support her conclusion. Additionally, Dr. LeStrap did not identify any differential etiology she used to arrive at her opinion.

In *Carroll v. Morgan,* 17 F.3d 787 (5th Cir.1994), also relied on by plaintiff, the court upheld the admission of a doctor's testimony finding that the testimony was based on thirty years of experience, a review of medical records, and on a broad spectrum of published materials. Dr. LeStrap's opinion in this case is simply not supported by the factors present in *Carroll.* Dr. LeStrap has virtually no experience, other than the standard training she received in school, in dealing with, and the

---

**2.** Additionally, plaintiff reported to work on the morning of the 23rd, in contravention of her doctor's orders, because she had exhausted her paid sick leave. Plaintiff had missed work the previous week and was aware that she had previously received warnings about excessive absences from work. These also indicate the presence of stress apart from her confrontation with the time-control office on the morning of May 23.

**3.** On September 17, 1998, plaintiff filed a Motion for Leave to File Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment. Plaintiff bases her motion on the Fifth Circuit's recent en banc reversal of the panel opinion in *Moore v. Ashland Chemical, Inc.,* 126 F.3d 679 (5th

Cir.1997). As explained above, the court's decision in this case would be the same based on either the *Moore* panel opinion or under *Daubert* and its progeny. Thus, plaintiff's motion to file supplemental memorandum is Denied. Further, the articles submitted by plaintiff for the first time at this late date do not change the court's conclusion that the evidence is insufficient to create a fact issue that Tubbs' confrontation with Parks at the lost time office caused Tubbs to develop preeclampsia. The literature submitted does not support the theory that a single incident of stress can lead to the development of preeclampsia. As discussed above, Tubbs was at risk for development of preeclampsia and was showing symptoms of the disorder prior to the incident at the lost time office.

causes of, preeclampsia. Dr. LeStrap can point to no medical literature, treatises, or studies that support her conclusion. Apparently, Dr. LeStrap has never reached this conclusion in any other case, nor has plaintiff attempted to corroborate Dr. LeStrap's opinion with the testimony of other physicians experienced in or knowledgeable about preeclampsia and its causes. Hence, the court finds that Dr. LeStrap's testimony as to the cause of plaintiff's preeclampsia is not admissible.

■ To satisfy the "extreme and outrageous" component of a claim of intentional infliction of emotional distress, the conduct must surpass "all bounds of decency, such that it is utterly intolerable in a civilized community ... Liability does not extend to mere insults, indignities, threats, annoyances, or petty oppressions." *Ward v. Bechtel Corp.*, 102 F.3d at 203. Moreover, Texas courts and the Fifth Circuit have recognized that, in the employment context, the broad range of conduct labeled as "mere employment disputes" does not give rise to an intentional infliction of emotional distress claim. *MacArthur v. University of Texas Health Center*, 45 F.3d 890, 898 (5th Cir.1995). Ordinary employment disputes do not rise to the level of "extreme and outrageous" behavior because, "[i]n order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline [its] employees." *Id.* Tubbs alleges that Parks yelled and argued with her and used obscenities. While using obscenities in the workplace is not to be condoned, the court cannot find that Parks' conduct rises to the level of "extreme and outrageous" such as to support an intentional infliction of emotional distress claim. Parks was frustrated and upset with plaintiff because of her constant absences from work. Plaintiff had previously been warned for excessive absences from work and for suspected abuse of sick leave. By May 1995, plaintiff had exhausted her sick leave for

the year. There was also apparently some issue as to whether plaintiff had provided the documentation from her doctor which American wanted.

■ Furthermore, plaintiff did not suffer distress so severe that "no reasonable [person] could be expected to endure it." *McKethan v. Texas Farm Bureau*, 996 F.2d 734, 742 (5th Cir.1993), *cert. denied*, 510 U.S. 1046, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994). Plaintiff maintains that Parks' conduct caused her to lose her baby. However, in light of the court's finding above, there is no evidence to support plaintiff's contention. The evidence is that Tubbs became upset and her blood pressure was elevated. However, within a few minutes after being taken to American's medical department, Tubbs' blood pressure dropped and stabilized at a level where it had been since at least May 18. Plaintiff has thus failed to establish a genuine issue of material fact in regard to two necessary elements of her claim, that Parks' conduct was outrageous and that her distress was severe. American's motion for summary judgment is granted with respect to plaintiff's claim of intentional infliction of emotional distress.

### B.   Race Discrimination

Claims of employment discrimination brought under Title VII of the Civil Rights Act of 1964 are analyzed under the framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and, more recently, in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[4] The *McDonnell Douglas/St. Mary's* framework is a three step process. First, the plaintiff must establish a prima facie case of discrimination. *St. Mary's*, 509 U.S. at 506, 113 S.Ct. 2742. Once established, the prima facie case raises a

---

**4.**   Claims of racial discrimination brought under 42 U.S.C. § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought

under Title VII. *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448, n. 2 (5th Cir.1996). Consequently, the following analysis applies to plaintiff's Title VII and § 1981 claims.

rebuttable presumption of discrimination and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer satisfies this burden of production, the plaintiff must then present evidence that the reason proffered by the defendant is actually a pretext for unlawful discrimination and that the defendant's employment decision was, in fact, informed by discriminatory motives. *Id.* at 507, 113 S.Ct. 2742. The ultimate burden of persuasion always remains with the plaintiff. *Id.* at 508, 113 S.Ct. 2742.

Because direct evidence of discrimination is rare, a jury may infer the requisite discriminatory intent circumstantially from a showing that the defendant's stated reasons for taking the employment action were false and pretextual. *Ontiveros v. Asarco Inc.*, 83 F.3d 732, 734 (5th Cir. 1996) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 994 (5th Cir.1996) (en banc)). However, the evidence put forth by the plaintiff to create a reasonable inference of discrimination must be substantial—that is, it must be "such as to allow a rational fact finder to make a reasonable inference that race was a determinative reason for the employment decision." *Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 141 (5th Cir.1996) (internal citations omitted). In order to avoid summary judgment on a Title VII claim, the plaintiff must therefore show that "the evidence, taken as a whole: (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that race was a determinative factor in the actions of which plaintiff complains." *Id.* Unless the plaintiff proffers sufficient evidence to create a reasonable inference of discriminatory intent, the plaintiff's claim cannot survive a proper summary judgment challenge. *Id.*

As discussed above, plaintiff must first establish a prima facie case of race discrimination by showing that (1) she is a member of protected class; (2) that she was subject to an adverse employment action; and (3) white employees were treated more favorably than she was in similar circumstances. *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 433 (5th Cir.1995). Plaintiff alleges four instances of race discrimination. Plaintiff alleges she applied for positions as a "manager on duty" and in weight and loads and did not receive either position. Plaintiff also alleges that when she was placed on light duty during her pregnancy, she was assigned to cabin services while white women were assigned to administration, vacation desk, line control, or passing out checks. Lastly, plaintiff alleges race discrimination in the way she was treated by the lost time office.

■ With respect to plaintiff's applications for the positions of "manager on duty" and in weight and loads, the court finds that plaintiff has not established a prima facie case of discrimination because she has not shown that whites were treated more favorably than she was under similar circumstances. Plaintiff's summary judgment evidence does not identify who the white persons were that were allegedly trained for the manager on duty position or the person who received the position in weight and loads. Plaintiff presents no evidence as to the requirements or qualifications of the jobs, or of the qualifications she possessed compared to the individuals who were ultimately hired, or that she was in fact qualified for either of the positions. In short, plaintiff presents no evidence of race discrimination other than her unsupported allegation that she was not given those jobs because of race discrimination. Such allegations are insufficient to defeat summary judgment. *Douglass v. United Services Auto. Ass'n*, 79 F.3d at 1429–30.

■■ In support of her claim of race discrimination with respect to the assignment of light duty, plaintiff submits the affidavits of two African–American women, Linda Baldwin and Sharon Brooks–Rucker, who allege that black women were assigned to cabin services and white women were assigned to light duty. However,

neither plaintiff's testimony nor the affidavits she submits identify the women who were so assigned, or identify the circumstances of the assignments. Thus, the court cannot determine whether American's actions were based on race or on legitimate reasons unrelated to race. Further, plaintiff submits affidavits from two white females who state that American failed to honor their doctor's requests that they be placed on light duty during their pregnancy. The affidavit of Janice Chaney, a white female, states that she was assigned to cabin services when she informed American that she was pregnant. Thus, plaintiff's own evidence shows that both white and black women were assigned to cabin services during their pregnancy. Again, plaintiff's allegations of race discrimination are unsubstantiated. An employee's mere subjective belief that she is being discriminated against is insufficient to sustain a claim for race discrimination. *Id.* In light of the entire summary judgment evidence presented, plaintiff's, Ms Baldwin's and Ms. Brooks–Rucker's generalized assertions of race discrimination appear to be mere subjective believe and are insufficient to defeat defendant's motion for summary judgment. *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir.1995) (neither plaintiff's nor co-worker's subjective beliefs of discrimination are sufficient to create jury issue).

Finally, plaintiff's allegations of race discrimination in her treatment by the lost time office are also insufficient to defeat American's motion for summary judgment. While, plaintiff's evidence shows complaints from several women, both white and black, about the lost time office's treatment of pregnant women, plaintiff presents no evidence, apart from her own assertions, of conduct on the part of defendant from which an inference of racial discrimination can be made.

The court finds that plaintiff has failed to establish a prima facie case of race discrimination with respect to any of her allegations and grants American's motion for summary judgment as to plaintiff's race discrimination claims.

## C. Sex Discrimination Claims

Plaintiff identifies three areas of sex discrimination of which she complains. First, Tubbs alleges sex discrimination based on a theory of hostile work environment on the basis of inappropriate comments and touching committed by co-workers and supervisors. Second, Tubbs alleges that American discriminated against her when she was pregnant. Third, Tubbs alleges sex discrimination because American would not allow her to work unless her doctor changed her lifting restrictions.

To state a claim under Title VII for gender discrimination based on a theory of hostile work environment, a plaintiff must prove (1) that she belongs to a protected class, (2) that she was subject to unwelcome harassment, (3) that the harassment was based on sex, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known about the harassment and failed to take prompt remedial action. *Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir.1996). To give rise to a cause of action, the questioned conduct must create an environment that a reasonable person would find hostile or abusive. *Id.* A hostile environment has been described as one "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of [female] workers." *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 924 (5th Cir.1982) (internal citations omitted). In determining whether an environment is hostile or abusive courts examine the totality of the circumstances focusing on factors including "the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." *Long v. Eastfield College*, 88 F.3d at 309. (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

Tubbs identifies several comments of a sexual nature made to her by co-workers and supervisors which she maintains constituted sexual harassment. The earliest comments were made in 1985 and latest was in either 1993 or 1994. Tubbs identifies one comment made by Jim Cahee in 1993 and one comment made by an unidentified employee which Tubbs states was made when she was pregnant in either 1989 or 1994. With the exception of these two comments, all of the comments identified by Tubbs were made between 1989 and 1992 or before 1989. Some of the comments are from unidentified persons, and Tubbs is uncertain as to the time when some of the comments are made. Additionally, Tubbs alleges that two co-workers improperly touched her. Plaintiff testified that a co-worker slapped her buttocks several times between 1985 and 1987. Plaintiff further testified that during 1991 and 1992, another employee, J.D. Coleman, rubbed his hand up and down her spine. Lastly, Tubbs complains about pervasive pictures, drawings and graffiti of a sexual nature.

While the comments and conduct identified by Tubbs are clearly improper, the court finds that Tubbs' claim of hostile work environment fails for two reasons. First, to the extent Tubbs' claim is based on inappropriate comments and touching, the claim is barred because Tubbs did not timely file a complaint with the EEOC regarding these incidents. Under Title VII, a plaintiff must file a charge with the EEOC within 300 days of the alleged unlawful employment practice or the claim is barred. *Webb v. Cardiothora-*

*cic Surgery Associates,* 139 F.3d 532, 537 (5th Cir.1998); *Mennor v. Fort Hood National Bank,* 829 F.2d 553, 556 (5th Cir. 1987). Tubbs filed a complaint with the EEOC on February 22, 1995, alleging race and sex discrimination. However, as set forth above, all of the incidents identified by Tubbs in her summary judgment evidence, with one possible exception, occurred far more than 300 days before Tubbs filed her complaint with the EEOC.[5] Second, as to improper comments and touching by co-employees and the graffiti, Tubbs fails to satisfy the fifth element of a sex discrimination hostile work environment claim, that is, that the employer knew or should have known about the harassment and failed to take prompt remedial action. *Long v. Eastfield College,* 88 F.3d at 309. Plaintiff presents no evidence that she informed anyone at American of the improper comments and touching.[6] In this case, plaintiff identifies some eleven comments which she maintains constituted sexual harassment. However, these comments were made from 1985 to 1993 or 1994, a nine to ten year period of time. The comments identified by plaintiff were not so pervasive that American should have known that a problem existed. Plaintiff presents affidavits which allege that sexual harassment was pervasive at American. However, the affidavits do not give specifics as to what comments the affiants found offensive, when the comments were made or who made them. The court finds that the general, conclusory statements submitted by plaintiff are insufficient to create a fact issue as to whether American was aware or should have been aware that plaintiff was being sexually harassed.[7]

---

5. Tubbs identifies one comment which she believes could have been made in 1994. However, Tubbs does not identify who made the statement or when it was made, and testified the statement could have been made in 1989.

6. Tubbs testifies that she complained to union stewards about the sexual harassment. Absent evidence that the union representatives informed American, the court finds Tubbs' actions insufficient to put American on notice

that sexual harassment is occurring in the workplace so as to trigger American's duty to take remedial action.

7. The evidence submitted by plaintiff as to the graffiti, pictures and drawings is sufficient to raise an issue regarding American's knowledge. However, the summary judgment evidence also establishes that American would periodically clean up the graffiti and removing offensive posters. Thus, American took

Since plaintiff did not inform anyone at American of the harassment by co-employees, and there is no evidence from which to infer that American should have been aware of the harassment, American was not given the opportunity to take remedial action. Plaintiff thus fails to establish a genuine issue of material fact in regard to a necessary element of her sexual harassment claim of a hostile work environment.

■ With respect to Tubbs' claim of sexual harassment by her supervisors, the summary judgment evidence identifies two supervisor who are alleged to have made improper comments or engaged in improper touching. One is Bob White who made two inappropriate remarks to Tubbs in 1985. The other is J.D. Coleman who made three inappropriate remarks to Tubbs between 1990 and 1992. Additionally, Tubbs testified that Coleman rubbed his hand up and down Tubbs' spine in 1990 or 1991. Thus, the latest incident involving her supervisors occurred in 1992. Tubbs' claims involving White and Coleman are time barred due to her failure to timely file a complaint regarding these incidents to the EEOC. Tubbs maintains that her claims are not barred because they are part of a pattern of sexual harassment at American which constitutes a continuing violation. In order to maintain a claim under a continuing violation theory, plaintiff must show that at least one incident of harassment occurred within the 300 day period. *Waltman v. International Paper Co.*, 875 F.2d 468, 475 (5th Cir. 1989). None of the incidents involving a supervisor occurred later than 1992, well before 300 days prior Tubbs' filing of her EEOC complaint. The incidents involving the lost time office and pregnancy discrimination of which Tubbs complains that did occur within 300 days of the filing of the EEOC charge are not sufficiently related to the incidents of comments and touching by supervisors as to constitute a continuing violation of those practices. The discrimination involving inappropriate touching and comments by supervisors were

prompt remedial action with respect to the

discrete acts which triggered Tubbs' obligations to timely file her EEOC complaint. *Webb v. Cardiothoracic Surgery Associates,* 139 F.3d at 537–38.

■ Plaintiff also alleges that American discriminated against her on May 23, 1994, when she was required by the lost time office to clock out and report to American's medical department for clearance to return to work. To establish a prima facie case of sex discrimination plaintiff must establish (1) that she was a member of a protected class, a woman, (2) that she suffered an adverse employment action, and (3) that male employees were treated more favorably in similar circumstances. *Ray v. Tandem Computers, Inc.,* 63 F.3d 429 (1995) (internal citations omitted). Plaintiff attaches a copy of American's maternity leave policy to her summary judgment response and argues that she was attempting to terminate her leave when she went to the lost time office. Plaintiff argues that the maternity leave policy places no restriction on a pregnant female returning to work under restricted duty. Plaintiff maintains that the lost time office's statement to Tubbs that a pregnant woman could not work light duty was made solely to harass plaintiff. Plaintiff contends this conduct raises an issue of pretext as to the defendant's reasons for requiring plaintiff to clock out to obtain clearance from the medical department. American submits the testimony of James B. Weel, a human resources manager, who states that in 1994, an employee who had been absent could be requested by the lost time office to explain her absence and provide medical documentation for the absence. Weel further states that depending on the nature of the illness, the lost time office could require the employee to be examined by American's medical department before returning to work. Additionally, Tim Gillespie, a union representative, testified that American's policy was for the employee to get clearance from medical

offensive graffiti and pictures.

after being cleared by the employee's doctor.

Prior to her pregnancy in late 1993, plaintiff had been warned and counseled several times about excessive absences from work. On January 8, 1994, prior to plaintiff informing American that she was pregnant, plaintiff was given a written warning that she was suspected of sick leave abuse. In conjunction with the warning, plaintiff was advised that a doctor's note would be required for each absence for the next 90 days. This was at least the sixth such warning received by plaintiff since her employment began. Plaintiff missed another week of work from April 4, 1994 through April 11, 1994, because of sinus problems. Plaintiff was again warned of sick leave abuse, and on April 18, 1994 was given a First Step warning, which is the first step in a progressive discipline process for unsatisfactory work attendance. Also, in April 1994 plaintiff was advised that she only had 24 hours of unused sick leave left for the year. Plaintiff missed work again on May 18, 19, and 20, 1994. Her sick leave expired on Saturday, May 21, 1994, and plaintiff returned to work on Monday, May 23 against her doctor's advise. On May 23, plaintiff was advised that her sick leave had expired on May 21, and was also advised that she would not be paid if she went to medical during her work time. Also, by May 23, 1994, plaintiff had submitted to American a letter from Dr. LeStrap dated May 18, 1994 informing American that plaintiff had been advised to not work until May 23, because tests needed to be performed due to complications in her pregnancy. American's maternity policy required a pregnant employee to provide documentation from her physician that she was capable of continuing working during the pregnancy. The policy also required an employee wishing to work beyond her 28th week of pregnancy to provide American with a statement from her doctor attesting to the employee's good health and her fitness to continue working. The policy further required consultation with American's medical department to determine whether the employee should continue working. The final decision regarding an employee's ability to continue working past her 28th week was made by American's medical department. At the time of plaintiff's miscarriage on May 24, she was in her 28th to 29th week of pregnancy. In sum, the court finds nothing in American's maternity leave policy which prevented the lost time office from requiring plaintiff to obtain clearance from American's medical department before returning to work. Moreover, plaintiff has not refuted American's evidence that the lost time office could require an employee who had previously been absent from work to obtain clearance from medical before returning to work. The lost time office monitored abuse of sick leave. Because plaintiff had been repeatedly warned of sick leave abuse, the lost time office was acting within its authority in requiring plaintiff to obtain clearance from medical before returning to work. Additionally, requiring plaintiff to clock out while she went to medical was not in contravention of American's policy since plaintiff had exhausted her sick leave. The court finds that plaintiff has failed to establish a prima facie case with respect to her disparate treatment sex discrimination claim because plaintiff's evidence is insufficient to show that she suffered an adverse employment action or that American's conduct was motivated by plaintiff's sex or because she was pregnant.

Plaintiff also alleges sex discrimination with respect to American not following her doctor's directive that plaintiff not be required to lift anything over 10 pounds. Plaintiff states she was told by American that she was useless to the company with such a restriction. Plaintiff alleges in her complaint that she then obtained a letter from her doctor allowing her to lift up to 30 pounds. Plaintiff, however, provides no evidence that American's policy, if it existed, of not allowing an employee to work who had a weight lifting restriction of not more than 10 pounds

applied only to pregnant women or that the policy was applied differently to pregnant women than to other employees.[8] In addition to the affidavit from Janice Chaney, plaintiff submits the affidavits of three other women who allege they were discriminated against and harassed by American when they were pregnant. While the affidavits raise concerns about American's treatment of those women, they are not specific and thus insufficient to raise a fact issue as to whether plaintiff was discriminated against or harassed because she was pregnant.[9] Sharon Brooks–Rucker states that she was placed on restricted duty when she was pregnant but was harassed by an individual in the lost time office. Brooks–Rucker identifies the harassment as the lost time office calling the gate where she worked every day and continuously wanting her to report to the lost time office. Brooks–Rucker also states that she had previously been out of work because of injuries and was never harassed like when she was pregnant. She also states she is aware of two other women who were harassed when they were pregnant. However, in neither instance does Brooks–Rucker specify the alleged harassment. Sally Samonek testifies that American would not follow her doctors weight lifting restrictions, but she does not specify what those restrictions were. She also states she was forced to work during her lunch hour and was harassed about her uniform. However, Samonek does not state that American's practice of making her work during her lunch hour applied only to pregnant wom-en or that the policy was applied to pregnant women differently than to other employees. She states she left work earlier than she wanted to because of the harassment. Samonek, however, does not identify how she was harassed other than as noted above. Linda Baldwin simply states in her affidavit, "I have been aware of pregnant females who have been harassed during their pregnancy." Baldwin does not specify who was harassed, how they were harassed, or by whom. The affidavits submitted by plaintiff are very thin on specifics and are thus insufficient to raise an issue as to whether plaintiff was subjected to discrimination or harassment because of her pregnancy or her sex. *Douglass v. United Services Auto. Ass'n,* 79 F.3d at 1429. Conclusory statements that "I have been harassed", without more, are insufficient to defeat summary judgment. Further, the specific acts of harassment identified, such as complaints for being out of uniform, the lost time office calling the gate where an employee works, and being asked to report to lost time, are, without more, insufficient to establish harassment or a hostile work environment. Moreover, plaintiff testified that as of May 1, 1994, the job she was doing satisfied the restrictions she was under at that time. The court finds that plaintiff's evidence fails to establish that she suffered an adverse employment action or was subjected to a hostile work environment because of her pregnancy or her sex.

Finally, plaintiff alleges sex discrimination with respect to American's harass-

---

8. The only evidence of the existence of such a policy is testimony from plaintiff and Janice Chaney. Chaney states that during her pregnancy in March 1994 her doctor restricted her work to not lifting more than 15 pounds. Chaney states her supervisor told her she was useless to the company with such a restriction. Chaney was subsequently told by union representatives to obtain a letter from her doctor allowing her to lift 35 pounds and they would take care of her so she would not be in any danger. However, a note dated March 5, 1994, sent from American's medical department to the lost time office indicated that plaintiff was not to lift over 10 pounds. Addi-tionally, Chaney does not state that American's alleged policy applied only to pregnant women or give specifics as to how the policy was applied differently to pregnant women than to other employees.

9. The court previously in this order denied plaintiff's motion to file these additional affidavits. The court addresses the affidavits here only to underscore its findings that plaintiff fails to establish the existence of fact issues that she has been subjected to discrimination by American either on the basis of her race, sex, or her pregnancy.

ment of plaintiff and other pregnant women for being out of uniform. Plaintiff testifies that Kelly Parks, an employee in the lost time office, told plaintiff on May 23, 1994, that Parks could send plaintiff home for being out of uniform. Plaintiff maintains that the regular uniforms did not fit women in advanced stages of pregnancy and that American did not provide uniforms to pregnant women. However, apart from statements that were made by American employees, there is no evidence that plaintiff was ever sent home or lost pay for being out of uniform. The court finds the evidence is insufficient to establish that plaintiff suffered an adverse employment action or was subjected to a hostile work environment. Further, the evidence fails to establish that higher management at American knew or should have known of the harassment and failed to take prompt remedial action.

### D. Family Medical Leave Act Claim

■ Tubbs seeks damages for American's failure to comply with the notice provisions of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654. The courts that have considered this issue have determined that the FMLA does not provide a private right of relief for an employer's violations of the notice provisions of the Act. Plaintiff cites no authority to the contrary. The court finds the reasoning of those cases persuasive and finds that plaintiff has no private right of action against American for any alleged violations of the notice provisions of the FMLA. Accordingly, since plaintiff does not state a valid claim, Tubbs' claims under the FMLA are dismissed.

### E. Other Matters

■ American maintains that plaintiff's claims are barred because they are preempted by the Railway Labor Act and because plaintiff failed to exhaust the grievance-arbitration provisions of the Collective Bargaining Agreement ("CBA"). The court finds the cases on which the defendant relies to be distinguishable and finds that plaintiff's claims are not preempted by the Railway Labor Act nor barred by plaintiff's failure to exhaust the grievance-arbitrations provisions of the CBA. Determination of plaintiff's claims does not depend on interpretation of the CBA. Further, the provisions of the CBA in this case do not require plaintiff to arbitrate her Title VII claims nor to go through the union grievance procedures.

### F. Plaintiff's Motion for Sanctions

■ Plaintiff seeks the imposition of sanctions on American's attorneys for filing a reply to Plaintiff's Supplemental Briefing in Opposition to American Airline's Motion for Summary Judgment. Plaintiff argues that the court requested each party to file only one supplemental brief and American disregarded that directive by filing a reply to plaintiff's supplemental brief. Plaintiff also alleges that American has made misrepresentations in various documents filed with the court. Plaintiff seeks sanctions pursuant to 28 U.S.C. § 1927 which prohibits attorneys from multiplying proceedings "unreasonably and vexatiously" when there is evidence of "recklessness, bad faith, or improper motive." *Travelers Ins. Co. v. St. Jude Hospital*, 38 F.3d 1414, 1416–17 (5th Cir.1994).

Upon review of the alleged sanctionable conduct, the court concludes that American's conduct was not unreasonable or vexatious nor was it in bad faith, with improper motive, or with reckless disregard of the duty owed to the court. Accordingly, plaintiff's motion for sanctions and to strike defendant's reply is Denied.

### CONCLUSION

After review of the arguments, authorities, and evidence in the record, the court finds that American's motion for summary judgment should be granted with respect to plaintiff's claims of race discrimination, sex discrimination, intentional infliction of emotional distress, and violations of the Family Medical Leave Act. A separate

judgment will be entered in accordance with the findings in this order.

SO ORDERED.