In the
United States Court of Appeals
For the Seventh Circuit

No. 98-4237

RICHARD WALKER,

Plaintiff-Appellant,

v.

SOO LINE RAILROAD COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 93 C 3861--Arlander Keys, Magistrate Judge.

Argued September 16, 1999--Decided March 31, 2000

Before RIPPLE, MANION and DIANE P. WOOD, Circuit Judges.

RIPPLE, Circuit Judge. Richard Walker filed this action against the Soo Line Railroad Company ("Soo Line"). He seeks damages for injuries suffered by having been struck by lightning while working in a railroad tower. At trial, Mr. Walker sought to introduce expert testimony to establish that electrical injury could have been the cause of his condition. Much of that testimony was excluded by the district court on the ground that it lacked a scientific basis. The district court also refused to admit testimony from an expert on electrical safety about how lightning could have penetrated the tower in which Mr. Walker was working. The district court allowed testimony from several Soo Line expert witnesses over Mr. Walker's objection. The jury returned a verdict for Soo Line. We conclude that several portions of the expert testimony excluded by the district court should have been admitted and that their exclusion severely curtailed Mr. Walker's ability to present his case. We therefore reverse the judgment of the district court and remand the case for a new trial.

I
BACKGROUND

In 1991 Richard Walker was employed by Soo Line as a tower operator. The job required him to direct railroad cars to particular tracks by

operating switches in a control tower. On October 24, 1991, Mr. Walker was working the 11 p.m. to 7 a.m. shift at the Bensenville rail yard. He was stationed in Tower A, one of two 75-foot towers in the yard. There was an electrical storm in the area that night. Mr. Walker claims that, at around 3 a.m., he received injuries from a lightning bolt as he was touching switches on his control board. He relates that he experienced chest pain and that his body heated up. Mr. Walker was hospitalized for two days, but returned to work a few weeks later.

In 1995 Mr. Walker brought this action against Soo Line under the Federal Employers' Liability Act, 45 U.S.C. sec. 51 et seq. ("FELA"). Initially, he claimed that the lightning strike had affected his hearing. Later, he amended his complaint to allege that the lightning strike had caused him psychological damage and had impaired his ability to work.

Mr. Walker was evaluated by the Electrical Trauma Research Program at the University of Chicago in December 1996. At trial, the district court excluded or limited the testimony of two expert witnesses from that program. One of these experts was Dr. Neil Pliskin, a psychologist who had examined Mr. Walker to determine his functional capability. Dr. Pliskin administered a battery of tests designed to test Mr. Walker's IQ, his concentration, and other functions. The district court permitted Dr. Pliskin to testify about the results of those tests; it did not permit, however, Dr. Pliskin's testimony about his evaluation of Mr. Walker's IQ before the incident or about any decline in his IQ since the incident. The district court excluded this evidence because Dr. Pliskin had not evaluated Mr. Walker before the incident and had relied on an erroneous account of Mr. Walker's educational history.

The leader of the University of Chicago team, Dr. Mary Capelli-Schellpfeffer, was not allowed to testify at all. Although there was no dispute about Dr. Capelli-Schellpfeffer's expertise on the subject of electrical trauma, the district court found that she improperly had relied on findings of other members of her team. Specifically, the court found that she had relied on Dr. Pliskin's findings about Mr. Walker's pre-injury functioning and excluded that testimony on the ground that it was based on an unreliable foundation. The district court also excluded as unreliable Dr. Capelli-Schellpfeffer's testimony that Mr. Walker was suffering from post-traumatic stress disorder because she was not a psychiatrist or psychologist and because her testimony conflicted with Dr. Pliskin's findings.

Mr. Walker also sought to introduce the testimony of Dr. Martin Uman, an expert on electrical safety and the chairman of the Department of Electrical Engineering at the University of Florida. Dr. Uman would have testified about the different ways by which electricity from lightning could have penetrated Tower A even if the lightning had not struck the tower directly. The district court barred that testimony as too speculative. However, Dr. Uman was allowed to testify in plaintiff's rebuttal case about the grounding and safety of Tower A after one of Soo Line's witnesses, Frank Denbrock, a safety inspector for Soo Line, testified that he had inspected Tower A and had found that it was properly grounded.

Dr. Adrian Upton was allowed to testify for Soo Line that there was no evidence that Mr. Walker was injured by any electrical trauma in November 1991. The district court also admitted records from Mr. Walker's treatment at the Madden State Hospital. Mr. Walker received psychiatric treatment there in 1972, 1973 and 1978.

II
DISCUSSION

We review the district court's evidentiary decisions, including decisions to admit medical expert testimony, for an abuse of discretion. See General Elec. Co. v. Joiner, 522 U.S. 136, ___, 118 S. Ct. 512, 517 (1997); United States v. Taylor, 154 F.3d 675, 683 (7th Cir.), cert. denied, 119 S. Ct. 629 (1998). In deciding whether to admit the proffered expert testimony, a district court must be guided by the instructions of Daubert. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Specifically, a district court is required to determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue. See id. at 592-93. We shall consider the district court's decision with respect to the testimony of each witness as well as its decision to admit the hospital records.

A. Dr. Neil Pliskin

Dr. Pliskin's qualifications as a professional psychologist are not in dispute. He was allowed to testify about Mr. Walker's post-incident IQ. To establish that IQ, Dr. Pliskin administered to Mr. Walker a battery of tests.

The district court refused, however, to allow testimony by Dr. Pliskin about Mr. Walker's functioning prior to the incident. Dr. Pliskin

acknowledged in his deposition that he relied in part on Mr. Walker's educational history in determining his pre-incident IQ. Parts of Mr. Walker's history, apparently including his educational history, had been reported to Dr. Pliskin by a woman named Vanessa Harris, described by the district court as Mr. Walker's girlfriend. The parties do not appear to dispute that her statements to Dr. Pliskin were made on behalf of Mr. Walker. The district court found, however, that the educational history on which Dr. Pliskin relied was inaccurate. Dr. Pliskin, according to the court, acknowledged that, if the account of Mr. Walker's educational history related to him by Harris was inaccurate, that inaccuracy would have affected his opinion on Mr. Walker's pre-incident IQ. The court also found that Dr. Pliskin was unsure whether electrical trauma would cause the drop in IQ he claimed to have found and that there were many other factors in Mr. Walker's life that might have caused his reduction in functioning.

Under Daubert, the first inquiry that must be undertaken is whether Dr. Pliskin relied upon a proper scientific methodology to determine Mr. Walker's pre-incident IQ. The record establishes that Dr. Pliskin's evaluation relied on the medical, educational and professional histories reported by Mr. Walker and Harris, and on his administration of the National Adult Reading Test, a test specifically designed to estimate a person's IQ before that person suffered a trauma. Medical professionals reasonably may be expected to rely on self-reported patient histories. See Cooper v. Carl A. Nelson & Co., Nos. 98-4169, 98-4222, 2000 WL 257140, at *11 (7th Cir. Mar. 7, 2000). Such histories provide information upon which physicians may, and at times must, rely in their diagnostic work. Of course, it is certainly possible that self-reported histories may be inaccurate. Dr. Pliskin himself said that it was not unusual for patients to misrepresent their histories to him. In situations in which a medical expert has relied upon a patient's self-reported history and that history is found to be inaccurate, district courts usually should allow those inaccuracies in that history to be explored through cross-examination. The Supreme Court in Daubert explained that the factual underpinnings of expert testimony may be subject to counter-attack. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); see also Cooper, 2000 WL 257140, at *11 (quoting Daubert). In this case, Soo Line appropriately could have presented evidence that Dr. Pliskin had relied upon an inaccurate history

and thereby called his conclusions into question. "[T]he accuracy and truthfulness of the underlying [educational] history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation." Cooper, 2000 WL 257140, at *11. Based on such evidence, a jury reasonably might have chosen not to credit Dr. Pliskin's testimony. Evidence demonstrating that other events in Mr. Walker's life affected his functioning might have led a jury to conclude that, even if Mr. Walker's IQ had dropped after the incident, that decrease was not due to any electrical trauma. On the other hand, the jury might have been convinced that, evaluating Dr. Pliskin's testimony in its entirety, his conclusions remained sound despite the defects in the patient history. The critical point is that Dr. Pliskin employed a proper methodology to determine Mr. Walker's pre-incident IQ. It was appropriate for Dr. Pliskin to rely on the test that he administered and upon the sources of information which he employed./1

Having determined that Dr. Pliskin's testimony was based on an acceptable methodology, we must consider whether it would have assisted the jury with a fact at issue. Soo Line argues that Dr. Pliskin's testimony should have been excluded because he does not state definitively that the electrical trauma caused the drop in Mr. Walker's IQ. Under FELA, causation is a jury question. See Scaggs v. Consolidated Rail Corp., 6 F.3d 1290, 1293-94 (7th Cir. 1993). From Dr. Pliskin's testimony, the jury could choose to infer that any electrical trauma Mr. Walker suffered caused his decline in IQ. Dr. Pliskin is not required to have an opinion on that ultimate question to be permitted to testify./2 His testimony could assist the trier of fact even if he cannot say with complete certainty that electrical trauma caused Mr. Walker's decline in functioning.

The district court expressed concern that the jury would not be "sophisticated enough to understand the cross-examination, the attempts by the defendant to bring out that Dr. Pliskin's opinion is really not as sound as he would give it on direct examination." The Supreme Court, however, has expressed its confidence in the ability of juries to understand complicated material, and we believe the district court should have allowed the jury to consider Dr. Pliskin's evidence in this case. See Daubert, 509 at 595-96 (acknowledging a party's concern about "a 'free-for-all' in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions" but finding those concerns "overly pessimistic about the capabilities of the jury and of the adversary system generally")./3

Of course, as Daubert made clear, the trial court must also keep in mind the other rules regarding the admissibility of evidence. See Daubert, 509 U.S. at 595. On this record, we cannot discern any independent reliance on the part of the district court on any other rule.

## B.  Dr. Mary Capelli-Schellpfeffer

The district court refused to allow any testimony by Dr. Mary Capelli-Schellpfeffer, the head of the clinical team at the University of Chicago that examined and evaluated Mr. Walker. Dr. Capelli-Schellpfeffer concluded, based to a significant extent on her discussions with members of the team, that Mr. Walker had post-traumatic stress disorder and had lost function because of an electrical injury. She was also prepared to testify that it was not unusual for electrical injuries to first manifest themselves long after the electrical trauma that caused them, as Mr. Walker argued his did. The district court determined that Dr. Capelli-Schellpfeffer was not qualified to testify about post-traumatic stress disorder because she was not qualified as a psychiatrist or psychologist. It acknowledged that she was qualified to testify about the effect of electrical trauma on the human body, but still barred her testimony in its entirety.

Although the district court's statement of its reasons for excluding Dr. Capelli-Schellpfeffer's testimony are not stated with optimal clarity, it is clear that the wholesale disallowance of this testimony was not an acceptable exercise of discretion. At the outset, we think that it was proper for a physician working in the role that Dr. Capelli-Schellpfeffer held on the diagnostic and evaluation team to rely on the work of her team members in forming her opinion. Medical professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions. See Birdsell v. United States, 346 F.2d 775, 779-80 (5th Cir. 1965) ("With the increased division of labor in modern medicine, the physician making a diagnosis must necessarily rely on many observations and tests performed by others and recorded by them . . . ."); see also Durflinger v. Artiles, 727 F.2d 888, 892-93 (10th Cir. 1984); Jenkins v. United States, 307 F.2d 637, 641-42 (D.C. Cir. 1962); Boehme v. Maxwell, 309 F. Supp. 1106, 1110 (W.D. Wash. 1968) (quoting Birdsell). Federal Rule of Evidence 703, the rule governing the appropriate bases of expert testimony, specifically contemplates, in its advisory committee notes, reliance on "reports and opinions from nurses, technicians and other doctors." Fed. R. Evid. 703; see also Southland Sod Farms v. Stover Seed

Co., 108 F.3d 1134, 1142 (9th Cir. 1997) (citing Rule 703). Indeed, courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable./4 Expert testimony relying on the opinions of others should, of course, be rejected if the testifying expert's opinion is too speculative, see Washington v. Armstrong World Indus., 839 F.2d 1121, 1123-24 (5th Cir. 1988), or the underlying basis is faulty, see National Bank of Commerce v. Dow Chem. Co., 965 F. Supp. 1490, 1523-24 (E.D. Ark. 1996), aff'd, 133 F.3d 1132 (8th Cir. 1998) (per curiam).

Soo Line argues that Dr. Capelli-Schellpfeffer's opinion that Mr. Walker suffered from post-traumatic stress disorder is unreliable because she relies primarily on Dr. Pliskin's work, and Dr. Pliskin concluded that Mr. Walker did not have post-traumatic stress disorder. That two different experts reach opposing conclusions from the same information does not render their opinions inadmissible. See Allapattah Servs., Inc. v. Exxon Corp., 61 F. Supp.2d 1335, 1341 (S.D. Fla. 1999) ("Merely because two qualified experts reach directly opposite conclusions using similar, if not identical, data bases . . . does not necessarily mean that, under Daubert, one opinion is per se unreliable."). Moreover, Dr. Capelli-Schellpfeffer also relied on the information of other professionals who examined Mr. Walker, including a psychiatrist, Dr. Kelly. This additional information, coupled with her own limited examination of Mr. Walker, reasonably could have led her to come to a conclusion different from Dr. Pliskin's. To the degree that she might have relied on faulty information, the matter certainly could be explored on cross-examination.

Nor do we believe that the leader of a clinical medical team must be qualified as an expert in every individual discipline encompassed by the team in order to testify as to the team's conclusions. The team approach to medical diagnosis and treatment is employed to ensure that all relevant disciplines work together for the good of the patient. The leader of that team is chosen because of her ability to assess accurately the role that each member of the team ought to play and to reconcile, when necessary, competing perspectives. In short, the expertise of the team leader is the capability to evaluate, in light of the overall picture, the contributions of each member of the team. Here, the district court found Dr. Capelli-Schellpfeffer to be an expert on the subject of electrical trauma. As part of that expertise, she naturally would be expected to have expertise on the subject of whether electrical injuries could

cause post-traumatic stress disorder. Dr. Capelli-Schellpfeffer is not a psychiatrist and well might not be able to render an opinion about diagnosing post-traumatic stress disorder on the basis of something other than electrical trauma. However, as the leader of a clinical team specializing in electrical injury, who reasonably relied on the expert opinions of specialists who also examined Mr. Walker, her conclusion that Mr. Walker suffered from post-traumatic stress disorder was a professional opinion that the jury had the right to consider.

C.  Dr. Martin Uman

Dr. Martin Uman, the chairman of the electrical engineering department at the University of Florida, testified in his deposition about different ways that lightning could have penetrated Tower A. Starting with the assumption that lightning could have hit in any one of several places in the rail yard, Dr. Uman offered testimony of how, from those several places, electricity could have penetrated Tower A. Dr. Uman said that Mr. Walker could have been injured through a direct hit to Tower A, through a hit to the light tower near Tower A, or through a hit to wires in the yard connected to a switch on Mr. Walker's control board, if Mr. Walker happened to be touching that switch at the time. He also acknowledged that it was possible that lightning could have hit the yard without injuring Mr. Walker in any way. The district court allowed only those portions of Dr. Uman's testimony that addressed the possible dangers if the tower had been struck directly by lightning; that testimony was only allowed in Mr. Walker's rebuttal case to contradict the testimony of Soo Line expert Frank Denbrock.

We must conclude that the district court's decision in restricting Dr. Uman's testimony cannot stand even under the deferential standard of review. Experts are allowed to posit alternate models to explain their conclusion. See Cole v. Control Data Corp., 947 F.2d 313, 319 (8th Cir. 1991) (permitting testimony about alternate models for calculating damages); John Morrell & Co. v. Local Union 304A, 913 F.2d 544, 558-59 (8th Cir. 1990) (allowing expert to testify about eight different damages models). The jury would have been assisted by learning different ways that lightning could have penetrated the tower.

This testimony could have been helpful even though Dr. Uman cannot say with any certainty where exactly lightning hit the rail yard, if it hit the rail yard at all. Dr. Uman intended to explain to the jury the ramifications of lightning striking at different points in the yard; the jury, based on eyewitness testimony and

on any meteorological evidence entered by the parties, could decide whether it thought lightning had in fact hit anywhere in the yard. The questions of whether lightning hit the yard, and if so where, were questions of fact. See Dallas County v. Commercial Union Assurance Co., 286 F.2d 388, 390 (5th Cir. 1961) (lightning striking clock tower); Hartford Fire Ins. Co. v. Thompson, 175 F.2d 10 (8th Cir. 1949) (lightning striking cattle). Such questions are for the jury. See Chandris, Inc. v. Latsis, 515 U.S. 347, 373 (1995); Robinson v. Burlington Northern R.R. Co., 131 F.3d 648, 653 (7th Cir. 1997). Soo Line, through evidence of its own, could have attempted to show that lightning did not strike any of the vulnerable points identified by Dr. Uman. It also could have presented testimony contradicting Dr. Uman's assertions that lightning striking various points in the rail yard could have affected someone working in Tower A. The jury then could have decided whether it thought lightning struck the yard and, if it concluded that lightning did strike, could have determined whether that lightning injured Mr. Walker. Dr. Uman had scientifically valid testimony that would have assisted the jury with its inquiry, and--assuming the testimony was in conformity with the other Federal Rules of Evidence--the district court should have allowed him to present that testimony to the jury.

D.  Frank Denbrock

Frank Denbrock, an electrical engineer who has extensive experience in the field of electrical safety, inspected the rail yard in 1997. He testified for Soo Line, over Mr. Walker's objection about the safety of Tower A. Expert testimony from technical fields is governed by the same concerns and criteria as the admission of medical expert testimony. See Kumho Tire Co. v. Carmichael, 119 S. Ct. 1167, 1174-76 (1999). The district court admitted Denbrock's testimony.

Mr. Walker contends that the district court conducted an inadequate Daubert hearing before choosing to admit Denbrock's testimony. We review de novo "whether the district court properly followed the framework set forth in Daubert." United States v. Hall, 165 F.3d 1095, 1101 (7th Cir.), cert. denied, 119 S. Ct. 2381 (1999). "Upon a determination that the district court properly applied the Daubert framework, the district court's decision to admit or exclude expert testimony is reviewed only for an abuse of discretion." Id. The discussion of Denbrock's qualifications took place in the context of a discussion about the qualifications of several witnesses. It is true that the district court did not articulate explicitly Denbrock's experience

in terms of the Daubert factors, but the district court's consideration of the question was not so inadequate as to render it faulty as a matter of law. When issuing oral rulings on Daubert questions, trial judges need not "recite the Daubert standard as though it were some magical incantation." See Ancho v. Pentek Corp., 157 F.3d 512, 518 (7th Cir. 1998).

On the factual issue of Denbrock's qualifications, the district court did not abuse its discretion by admitting Denbrock's testimony. Mr. Walker argues that Denbrock's testimony should have been excluded because his inspection was inadequate and his conclusions were faulty. Mr. Walker is correct that shoddy preparation by an expert might evidence a lack of professional qualifications on the part of a proffered witness. See Ancho, 157 F.3d at 516-19. We are not prepared to say, however, that the district court's decision to admit Denbrock's testimony was an abuse of discretion. Denbrock was offered as an expert on the basis of his work for a power company, where he was responsible for ensuring the safety of its facilities from lightning. Denbrock demonstrated professional experience in the area of electrical safety, and Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience. See Kumho Tire, 119 S. Ct. at 1174; Hall, 165 F.3d at 1101. Although the district court did not discuss Denbrock's personal knowledge of the site in question at the Daubert hearing, Denbrock testified at trial that he personally had inspected the tower. If there was evidence that Tower A was unsafe that Denbrock should have considered but did not, or if there was reason to believe that Denbrock's investigation was shoddy, Mr. Walker could have uncovered those flaws through cross-examination and through the presentation of contrary evidence. Here Denbrock provided a sufficient showing of his expertise. The district court did not abuse its discretion by allowing Denbrock's testimony.

E.  Dr. Adrian Upton

Dr. Adrian Upton is a medical expert witness who testified for Soo Line. He testified about Mr. Walker's medical condition after reviewing Mr. Walker's medical records. Mr. Walker argues that Dr. Upton was not qualified to testify on the subject because he did not have sufficient experience in trauma caused by lightning and personally had not examined Mr. Walker.

Dr. Upton's specialty is the effect of electric current on the human body. There is no dispute as to his medical qualifications. In allowing Dr.

Upton to testify, the district court relied upon Dr. Upton's experience in treating patients with electrical injuries and upon Dr. Upton's examination of Mr. Walker's medical records. These factors were a sufficient basis for the district court to find Dr. Upton qualified as an expert witness. The lack of an examination of Mr. Walker does not render Dr. Upton's testimony inadmissible. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 762 (3d Cir. 1994) ("[W]e think that evaluation of the patient's medical records, like performance of a physical examination, is a reliable method of concluding that a patient is ill even in the absence of a physical examination."). Indeed, we have said that the examination of medical records can be an important part of an expert witness' preparation. See O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1107 (7th Cir. 1994). The district court did not abuse its discretion by admitting Dr. Upton's testimony.

F. The Madden State Hospital Records

The district court allowed Soo Line to introduce into evidence Mr. Walker's records from Madden State Hospital. Soo Line quoted from the records during closing argument. Mr. Walker was a patient on three occasions: in 1972, 1973 and 1978. The portion of the record quoted by Soo Line during closing argument noted that Mr. Walker was admitted in 1972 for six weeks of treatment, and then again in 1978. Mr. Walker argues that the records should not have been admitted because his hospitalization occurred so long before the events at the rail yard that they could not be relevant to his condition at that time. Nonetheless, Dr. Pliskin, a witness for Mr. Walker, acknowledged at trial that he would have liked to have known about Mr. Walker's hospital stay when preparing his evaluation of Mr. Walker's pre-incident abilities. On this record, we see no reason to disturb the decision of the district court.

G. Harmless Error

Soo Line also submits that any error by the district court in the admission of evidence is harmless. We shall vacate a jury verdict only if error substantially influenced the jury. See Palmquist v. Selvik, 111 F.3d 1332, 1339 (7th Cir. 1997); Groom v. Days Inn, 62 F.3d 204, 208 (7th Cir. 1995). Here, the excluded testimony from Dr. Pliskin, Dr. Capelli-Schellpfeffer, and Dr. Uman formed a substantial portion of Mr. Walker's case. Our examination of the record convinces us that the exclusion of their testimony was not harmless error.

Conclusion

For the foregoing reasons, the jury verdict is reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED

/1 Mr. Walker also contends that the district court should have allowed Dr. Pliskin to testify about Mr. Walker's pre-incident IQ because Soo Line opened the door to this topic in its cross-examination of Dr. Pliskin. Because we hold that Dr. Pliskin's testimony should have been allowed as part of Mr. Walker's case-in-chief, we need not address this argument.

/2 Historically, witnesses were expressly prohibited from testifying about the ultimate issues facing the jury. See Fed. R. Evid. 704 advisory committee's note. That prohibition was eliminated in the federal courts by Federal Rule of Evidence 704, which allows such testimony (subject to an exception in criminal cases not relevant here). See Fed. R. Evid. 704; United States v. Baskes, 649 F.2d 471, 479 (7th Cir. 1980). Nothing in that rule, or any other rule governing expert testimony, requires an expert to opine on the ultimate issue in order to have his testimony admitted.

/3 There may be cases in which a patient's self-reported history is so patently misleading as to make it unreasonable for an examining physician to place any reliance on it. On this record, however, it is clear that we have no such case before us. Dr. Pliskin's testimony should not have been excluded under Daubert solely on the ground that his patient's self-reported history contained some inaccuracies.

/4 See, e.g., Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995); United States v. Lawson, 653 F.2d 299, 301-02 (7th Cir. 1981); Antoine-Tubbs v. Local 513, Air Transp. Div., 50 F. Supp.2d 601, 609 (N.D. Tex. 1998) (citing Moore v. Ashland Chem., Inc., 126 F.3d 679, 690-91 (5th Cir. 1997), rev'd en banc, 151 F.3d 269 (5th Cir. 1998) and cert. denied, 119 S. Ct. 1454 (1999)), aff'd, 190 F.3d 537 (5th Cir. 1999); Gess v. United States, 991 F. Supp. 1332, 1338 (M.D. Ala. 1997).