John P. **DARTEY** and Betty Dartey, Plaintiffs,

v.

**FORD MOTOR COMPANY** and Cable Manufacturing and Assembly, Inc., Defendants.

No. 1:99–CV–107.

United States District Court, N.D. Indiana, Fort Wayne Division.

July 10, 2000.

Frank Gray, Beckman, Lawson, Sandler, Snyder and Federoff, Fort Wayne, IN, for Frank Gray, mediator.

Joseph Christoff, Sr., Christoff and Christoff, Fort Wayne, IN, for John P. Dartey, plaintiff.

Kevin C. Schiferl, Locke Reynolds Boyd and Weisell, Indianapolis, IN, for Ford Motor Company, defendant.

Thomas C Ewing, Hunt, Suedhoff, Kalamaros LLP, Fort Wayne, IN, for Midway Products Group Inc, defendant.

Kevin K. Fitzharris, Barrett and McNagny, Fort Wayne, IN, for Cable Manufacturing and Assembly Inc., defendant.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This is a products liability action brought by John and Betty Dartey (collectively, "the Darteys" or "the Plaintiffs") against Ford Motor Company ("Ford")[1] alleging that the cables supporting the tailgate on their 1989 Ford F–150 Pickup

---

1. The Darteys also sued Cable Manufacturing and Assembly, Inc ("CMA"). CMA has notified the Court that it is in the process of settling the Darteys' claim against it.

truck fractured as John Dartey was standing on it, thereby causing him injury. Plaintiffs' lawsuit seeks monetary damages against Ford pursuant to Indiana's Product Liability Act, IC § 34-20, *et seq.,* under strict liability theories of defective design, failure to warn, and breach of warranty. Betty Dartey seeks additional damages for loss of consortium.

Presently before the Court are two Motions in Limine filed by Ford on February 28, 2000, seeking to exclude the testimony of plaintiffs' proffered experts Donald Wulpi ("Wulpi") and Dr. Norman Behn ("Dr.Behn"). The Darteys responded to both motions on March 14, 2000 and Ford replied on March 28, 2000. Pursuant to Ford's request under N.D.Ind.L.R. 7.5, this Court held an evidentiary hearing on June 28, 2000 at which time all parties had an opportunity to present evidence relating to the motions in limine. Immediately prior to this hearing, the Plaintiffs filed their "Motion for Extension of Time for Disclosure of Expert Testimony" seeking an extension until July 28, 2000 to disclose additional experts. The Court took this motion under advisement in addition to the motions in limine and ordered the parties to submit additional briefing relating to the motions in limine. This briefing was completed on July 6, 2000.

For the following reasons, Ford's Motions in Limine will be GRANTED in part and DENIED in part. Plaintiffs' Motion for Extension of Time for Disclosure of Expert Testimony remains UNDER ADVISEMENT.

### DISCUSSION

"Federal district courts have the power to exclude evidence *in limine* pursuant to their authority to manage trials." *Charles v. Cotter,* 867 F.Supp. 648, 655 (N.D.Ill.1994) (*citing Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463, n. 4, 83 L.Ed.2d 443 (1984)). In *Hawthorne Partners v. AT & T Technologies,* 831 F.Supp. 1398 (N.D.Ill.1993), the court set forth the considerations governing a motion in limine as follows:

This court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of the trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine.*

*Id.* at 1400–01. Thus, as the term "in limine" suggests, a court's decision on such evidence is preliminary in nature and subject to change. *United States v. Connelly,* 874 F.2d 412, 416 (7th Cir.1989). With these principles in mind, the Court now turns to the testimony Ford seeks to exclude by way of its motion in limine.

Plaintiffs intend to call two expert witnesses, Wulpi, a metallurgical engineer, and Dr. Behn, a plastics expert, to testify at trial regarding the design of the tailgate support cables and the plastic casing used to protect those cables. At both the evidentiary hearing and in his deposition, Wulpi testified that the metal wires supporting the tailgate on the Darteys' truck fractured due to metal fatigue brought on by the long-term opening and closing of the tailgate, further aggravated by corrosion. Wulpi further opined that the metal utilized to support the tailgate was unsuitable for long-term use and thus, the Ford design which required the support cables to rest in a confined space over the long-term created a scenario where the metal wires were bound to fail. As part of his in-court testimony, Wulpi proposed an alternative tailgate design involving metal

hinges which, in his opinion, is a better design than the metal cables.

Dr. Behn testified at the evidentiary hearing (and during his deposition), regarding the plastic sheathing that encases the wire. Dr. Behn testified that upon his inspection of the material encasing the wire he discovered that the casing was made of a thin, flexible nylon material, information which he confirmed using an independent laboratory. Dr. Behn further stated that his inspection of the cables on the Darteys' truck revealed that the nylon sheathing was cracked and hard along the entire expanse of the cable and, due to this condition, the nylon material permitted moisture to seep through the plastic sheathing and corrode the metal wires. Dr. Behn opined further that the nylon material was not capable of withstanding long-term use and therefore the nylon would not remain intact for the life of the truck, which he estimated to be ten (10) years. As for possible alternative designs, Dr. Behn indicated that a better plastic material called a thermoplastic elastimer ("TPE") was available around the time the Darteys purchased their vehicle and that this product was more flexible and "slightly better" than the nylon material utilized in the Darteys' truck. However, Dr. Behn ultimately concluded that neither product, in his opinion, could withstand a long-term application such as was utilized in the Ford F–150 truck.

Anticipating the above testimony to be duplicated at trial, Ford seeks to exclude the testimony contending that these experts lack experience in designing tailgates or tailgate support components, and as a result, their opinions that Ford's design was defective or that the truck should have conformed to some alternate design are mere speculation. After a review of the legal standards to be applied to the admissibility of expert testimony, the Court shall consider the parties' arguments.

■ The admissibility of expert testimony—whether based on "scientific," "technical," or "other specialized" knowledge—is governed by Fed.R.Evid. 702 and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589–592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Stated simply, a threshold matter under Fed.R.Evid. 702 requires a district court to determine "(1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue." *Smith v. Ford Motor Company,* 215 F.3d 713, 717 (7th Cir.2000) (quoting *Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 590 (7th Cir.2000)).

■ The Supreme Court in *Daubert* and more recently in *Kumho Tire Co. Ltd., v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) provided further guidance on the court's task under Fed. R.Evid. 702, by emphasizing the district court's "gatekeeping" function to ensure that expert testimony, be it traditional scientific evidence or founded on engineering principles or other technical or specialized knowledge, is both reliable and relevant. *Kumho,* 526 U.S. at 141, 119 S.Ct. at 1171 and 1176. The fundamental purpose of this gatekeeping requirement "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 152, 119 S.Ct. at 1176. Indeed, the gatekeeping role is designed "to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." *DePaepe v. General Motors,* 141 F.3d 715, 720 (7th Cir.1998).

■ The basic task of the district court with regard to analyzing reliability is

to determine whether the expert is qualified in the relevant field and to examine the methodology the expert used in reaching his conclusions. *Kumho Tire,* 526 U.S. at 153, 119 S.Ct. at 1176–1177. In examining whether the expert is qualified in the relevant field, the court should consider a proposed expert's "full range of practical experience as well as academic or technical training." *Smith,* 215 F.3d 713, 717. Further, when examining the expert's methodology, the court must look only at the methodology employed by the expert. *Id.* In other words, "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho,* 526 U.S. at 149, 119 S.Ct. at 1175 (brackets in original) (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2786). The court must leave it to the trier of fact to evaluate the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis." *Id.*

■ *Kumho* further indicates that in assessing reliability the district courts are entitled to be "flexible" and are not required to consider the familiar *Daubert* "factors" (i.e., whether a theory or technique can be or has been tested, whether it has been subjected to peer review and publication, whether it has a known or potential error rate, and whether it enjoys a general acceptance within a relevant scientific community) in every case involving expert testimony. Rather, the Supreme Court held that the decision to apply some or all of the *Daubert* factors in a particular case lies within the district court's discretion. *Kumho,* 526 U.S. at 150, 119 S.Ct. at 1175 ("the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.") (citation omitted); *Id.* 119 S.Ct. at 1176 ("whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a par-

ticular case is a matter that the law grants the trial judge broad latitude to determine.").

■ As for the relevance inquiry, the Seventh Circuit recently explained that:

... the district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact in issue. This second step requires that the district court consider whether the proposed scientific testimony fits the issue to which the expert is testifying. In other words, a district court may admit expert testimony only if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue.

*United States v. Hall,* 165 F.3d 1095, 1102 (7th Cir.1999) (internal quotation marks and citations omitted); *Smith,* 215 F.3d 713, 717 ("the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case."). However, "[t]he expert need not have an opinion on the ultimate question to be resolved by the trier of fact to satisfy this requirement." *Smith,* 215 F.3d 713, 717 (citing *Walker,* 208 F.3d at 587 (7th Cir.2000)). Thus, an expert may posit alternate models to explain their conclusions or may provide hypothetical explanations of possible or probable causes of an event if these models or explanations would aid the jury in its deliberations. *Id.*

With this legal framework in mind, the Court shall proceed to the reliability and relevance inquiries as they relate to the proposed expert testimony.

### a. *Testimony of Donald Wulpi*

■ Turning first to the reliability inquiry, the Court must analyze whether the expert is qualified in the relevant field and only then does the court examine the methodology the expert used in reaching his conclusions. *Kumho Tire,* 526 U.S. at 153, 119 S.Ct. at 1176–1177.

From their submissions, the Defendant concedes that Wulpi has sufficient education and experience to qualify as a metallurgist and this court likewise has no doubt in this regard. (Reply, p. 2). Wulpi is a trained metallurgist, having obtained his Bachelor of Science degree in metallurgical engineering in 1949 from Lehigh University. After obtaining his degree, Wulpi was employed by International Harvester for thirty-one years, working in various capacities ranging from a Metallurgist and Research Metallurgist to the Head of the Metallurgucal Laboratory, Truck Group Engineering. For the past twenty years, Wulpi has been the owner of a metallurgical consulting business. In addition to his work and educational experience, from 1956 through 1990, Wulpi has regularly published articles and books related to his field and relating to failure analysis. Thus, Wulpi is clearly qualified by both education and experience to testify regarding metallurgical matters.

Despite these qualifications, Ford urges this court to exclude Wulpi's proposed testimony because he is not adequately educated or experienced in the field of design engineering and, thus, lacks knowledge or information regarding alternative designs. Ford further contends that Wulpi's methodology is unsound in that "he has not tested alternative designs; he does not know the weight or loads placed on the tailgate on the date of the incident or on prior occasions; [and] he does not know how an alternative design might interact with the truck body components." (Ford's Brief, p. 4). In response, the Darteys' argue that Wulpi is an expert in how metals fail and that his testimony relates to the choice of materials used by Ford in designing its tailgates. Plaintiffs further contend that Wulpi's testimony is relevant in that the testimony will assist the trier of fact by explaining "how the manner of the design itself affects the cable materials and how that could lead to or contribute to a failure of the cable." (Response, p. 4).

During both Wulpi's proposed deposition testimony and his in-court testimony, Wulpi acknowledged that he has no design experience and is not a design expert. This fact, however, does not automatically negate all of Wulpi's proposed testimony. *See Smith*, 215 F.3d 713, 719.

In *Smith*,[2] the plaintiff sued Ford alleging that injuries he sustained in an accident were caused by a manufacturing and design defect in the power steering gearbox of the Ford van he was driving. *Id.* at 716. Smith proffered testimony from a metallurgical engineer with both a bachelor's degree in that field and over forty years of practical experience who opined that the steering had failed due to overloading of the torsion bar and this failure was the result of either a manufacturing or design defect. The expert also offered several hypothetical explanations for the failure and stated that using a different metal for the torsion bar would have been a better choice. *Id.* at 716. The district court excluded the expert's testimony because it concluded that the expert was not qualified in the relevant field of automotive design and therefore, his conclusions were unreliable and would not aid the jury. The Seventh Circuit reversed stating:

> We agree with the district court that [the experts] are not qualified as automotive engineers. However, we disagree with the district court's subsequent conclusion that because these engineers are not qualified in the field of automotive design or manufacture, their expertise cannot be relevant to the present case. As we discuss below, expert testimony need only be relevant to evaluating a factual matter in the case. That testimony need not relate directly to the ultimate issue that is to be resolved by the trier of fact. Thus, the district court erred in concluding that [the experts] were not qualified solely because their expertise related to an area other than the one

2. Ford's counsel in this case was also counsel for Ford in the *Smith* case.

concerning the ultimate issue to be decided by the trier of fact.

*Id.* at 719.

■ The same rationale applied by the Seventh Circuit in *Smith* is warranted here. Wulpi admits that he is not an automotive design engineer and that his expertise is in failure analysis, or metallurgical science. Likewise, the Plaintiffs appear to concede as much, but nonetheless desire Wulpi to be able to offer opinions outside his expertise regarding alternative tailgate designs and an opinion that the metal cable design was defective. As was the case in *Smith*, Wulpi's expertise relates to an area other than the one concerning the ultimate issue at trial, i.e., whether there existed a design defect in the metal cables, and his testimony shall be limited to opinions falling within his expertise. He shall not be precluded from describing to the jury the manner in which the metal cables failed and describing, based upon his background and experience in metallurgical science, why, in his opinion, the metal cables were bound to fail. This, however, is where Wulpi's expertise, and consequently his testimony, ends. Testimony relating to alternative designs and the ultimate issue of design defect is beyond Wulpi's expertise and thus, does not pass muster as reliable testimony under the standards of *Daubert* and *Kumho*.

■ Ford, however, also seeks to have even this limited testimony excluded because Wulpi's methodology in reaching his opinion regarding how the metal cables failed is unsound. For instance, Ford points to Wulpi's testimony that he did no testing of his own theory about how the cables fractured, his opinions were not subjected to peer review, and he did not inquire about the load which the Darteys placed on the tailgate throughout their

ownership of the truck. Ford further asserts that under the factors listed in *Daubert*, the above-noted testimony proves that Wulpi's conclusions are unreliable.

As indicated *supra*, no single factor among the traditional *Daubert* factors is conclusive in determining whether the methodology relied upon by a proposed expert is reliable, *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167, and this court must make an individualized inquiry into the proffered expert's testimony. *Smith*, 215 F.3d 713, 719 (citing *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167 (stating that in some cases "the relevant reliability concerns may focus upon personal knowledge or experience")). In this case, Wulpi's proposed expert testimony regarding how the metal cable failed is elementary in nature.[3] Indeed, Wulpi suggested throughout his testimony that the scientific principles involved in his opinion are "obvious" and thus, he had no need to test his own theory further or submit his opinions for peer review. Further, Wulpi applied well-established scientific principles, based upon his education and experience, in reaching his conclusions. Given these factors, Wulpi's failure to have his conclusions tested or submit his methodology for peer review do not cast doubt on the reliability of his opinion as to how the metal cables failed. *See Smith*, 215 F.3d 713, 719 ("if [the expert] was merely applying well-established engineering techniques to the particular materials at issue in this case, then his failure to submit those techniques to peer review establishes nothing about their reliability.").[4]

■ Having concluded that portions of Wulpi's proffered testimony is reliable, the Court turns next to Ford's assertion that his testimony is not relevant, a determina-

---

**3.** The layperson's interpretation of Wulpi's testimony is that metal wires will eventually fracture if, over time, they are repeatedly bent in the same location.

**4.** This is not to say that Ford may not cross-examine Wulpi as to the scientific methodology underlying his opinion or regarding his

knowledge of events which may alter his opinion (for instance, evidence of the load the Darteys regularly placed on the tailgate). Ford may certainly question the reliability of Wulpi's testimony on cross-examination and may inquire about the scientific principles involved.

tion which requires only minimal discussion in this case. To be relevant under Rule 702, the proffered testimony must only assist the jury in determining any fact in issue is a case. Relevant testimony is not excluded simply because the testimony does not relate to the ultimate issue in the case. *Walker*, 208 F.3d at 587, fn. 2 ("Nothing in [Fed.R.Evid. 704], or any other rule governing expert testimony, *requires* an expert to opine on the ultimate issue in order to have his testimony admitted."). Here, Wulpi's testimony (as limited above), while not relating to the ultimate issue of the existence of a design defect, is helpful to explain to the jury how and why the metal cables supporting the tailgate failed causing John Dartey's injury. Consequently, the Court concludes that Wulpi's testimony (as limited) is relevant and will assist the jury in understanding the facts and circumstances surrounding the Darteys' claim.

Accordingly, Ford's Motion in Limine to Exclude the Testimony of Donald Wulpi is GRANTED in part and DENIED in part, as indicated herein.

### b. *Testimony of Dr. Norman Behn*

Turning next to the second expert, Ford challenges Dr. Behn's testimony on many of the same grounds that it challenged Wulpi's testimony. For instance, Ford persists in its position, as it did with Wulpi, that all of Dr. Behn's testimony should be excluded because he is "obviously not qualified to testify regarding design or manufacturing defects." (Reply, p. 2). Ford further objects to Dr. Behn's testimony that a plastic material called TPE should have been used on the casing of the tailgate support cables claiming that Dr. Behn's lack of formal training in design matters combined with the fact that he did not test TPE before coming to the conclusion that TPE plastic is a better design, make his testimony inadmissible. For many of the same reasons previously discussed in an analysis of Wulpi's testimony, this Court shall not adopt Ford's position as to all of Dr. Behn's testimony.

As with Wulpi, Dr. Behn's qualifications show him to be well-qualified to provide testimony regarding the materials utilized for the plastic casing enclosing the metal wires. Dr. Behn received a Ph.D in organic chemistry from the University of Kansas in 1967 and has numerous professional affiliations as well as job experience in the plastics industry with companies such as duPont de Nemours and National Plastics Corporation. During his testimony, Dr. Behn stated that while his degree is in organic chemistry, his field of expertise is in polymers. Given this background, the court concludes that, like Wulpi, Dr. Behn's education and experience qualify him to testify regarding issues relating to polymers, or in this case, the plastic casing enclosing the metal wires. The sole remaining question is what specific testimony Dr. Behn may provide that is within this expertise.

As noted earlier, Dr. Behn proposes to testify that the nylon sheathing encasing the metal cables was cracked and hard along the entire expanse of the cable and, due to this condition, the nylon material permitted moisture to seep through the plastic sheathing and corrode the metal wires. This testimony, like Wulpi's, relates to the materials utilized by Ford for the tailgate, describes how the nylon material failed, and contributed to the corrosion of the metal wires and thus, is within his experience and education. Dr. Behn further proposes to testify that TPE is a better substance which, if utilized in place of the nylon offered "slightly better" results, although in his opinion neither would withstand long-term use. This testimony also relates to Ford's choice of materials and is similarly within Dr. Behn's area of expertise. As part of this testimony, Dr. Behn is entitled to describe to the jury the differences in the organic makeup of TPE and nylon. What Dr. Behn cannot proffer to the jury directly is any opinion that the failure to use TPE made the design of the tailgate defective. Although a jury may infer from Dr. Behn's testimony that Ford's choice of nylon over TPE is a design defect, Dr. Behn may not directly

make such a representation to the jury as it falls outside of his range of expertise and involves design issues about which Dr. Behn is not qualified to provide guidance. Thus, with respect to the reliability determination, the Court concludes that some of Dr. Behn's testimony, as discussed herein, is reliable and appropriate for trial.[5]

 Ford, however, argues that Dr. Behn's testimony concerning TPE will not assist the jury and is not relevant because: (1) he has not tested TPE plastic; (2) he has not designed a tailgate using TPE plastic; (3) he cannot confirm that any automobile manufacturer ever used TPE at the time of or before the design of the 1989 Ford F-150 tailgate; and (4) he does [not] have evidence to dispute that nylon casings were state of the art at the time of the design of the tailgate assembly of the Ford F-150 at issue. All of these facts maybe true, yet they do not foreclose the jury from hearing Dr. Behn's testimony and giving it the weight it deems appropriate. Indeed, the Seventh Circuit has recently re-emphasized *Daubert's* admonition that, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Walker,* 208 F.3d at 586 (citing and quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786). Here, an examination of these facts by Ford on cross-examination may lead a reasonable jury to discredit Dr. Behn's testimony that TPE may have performed

better than nylon.[6] Further, Ford is certainly entitled to put on rebuttal testimony indicating that TPE was not available for use in 1989 Ford F-150 trucks or that TPE, while available, would not perform any better than the nylon casing that was already utilized on the truck.

Having reached the conclusions, a few cautionary words are appropriate. As with all pre-trial rulings on motions in limine, the holdings with respect to Dr. Behn's testimony are preliminary determinations subject to be revisited at trial. In particular, the Court is well aware that throughout this lawsuit, the Darteys' theory of the case has remained steadfast that the plastic casing enclosing the wires was defective. It is the Plaintiffs' position that the nylon material hardened and cracked over time and failed to protect the metal wires from moisture, thereby contributing to the failure of the metal cables. The underlying premise for this theory is that the nylon casing was intended by Ford to provide protection for the metal wires and it failed to do the job for which it was intended. At oral argument, Ford stated that it would stipulate at trial that the nylon casing was not intended by Ford to provide such protection and that the purpose of the nylon casing was to control vibration. This appears consistent with Ford's defense that the metal cables did not require protective plastic casing because the metal cables were galvanized, a theory Plaintiffs dispute using Wulpi's testimony.[7] This notwithstanding, if, at trial,

---

5. Ford does not appear to dispute the methodology underlying Dr. Behn's conclusions regarding either the nylon or TPE. For instance, Dr. Behn testified regarding certain characteristics of each material, i.e., one is more flexible than the other, one has more rubber than the other, etc. In fact, it appears that Dr. Behn's methodology is sound in that an independent lab ran tests to determine the composition of the casing on the Darteys' truck and that the characteristics of the various materials are commonly known in the plastics field. Ford also appears to have no objection to Dr. Behn's conclusion that the nylon material would not remain intact during long-term use. Finally, Ford appears to agree with Dr. Behn's testimony regarding the characteristics of the various substances.

Ford does, however, vigorously dispute whether Dr. Behn's testimony regarding TPE is relevant in the case, a point which is thoroughly discussed in the next section.

6. Indeed, Dr. Behn acknowledged during the *Daubert* hearing that neither the nylon or the TPE substance would have provided adequate protection from moisture or corrosion over the long-term. Further, even a cursory review of Dr. Behn's deposition testimony demonstrates the fertile ground Ford has for cross-examination of his opinions.

7. Wulpi testified that he saw no evidence of galvanization on the metal cables.

Ford stipulates as discussed above, it is possible (perhaps even likely) that Dr. Behn's testimony that the nylon casing was inadequate for providing protection from the nature's elements is not relevant to any issue in the case.[8] Moreover, although this Court has preliminarily ruled that Dr. Behn may provide an opinion regarding the use of TPE, the Court may reexamine this issue at trial given Dr. Behn's testimony during the *Daubert* hearing that neither nylon or TPE, had it been used, would remain intact during the life of the truck. This testimony severely undercuts the Plaintiffs' contention that TPE was a better material than the nylon casing and that Ford should have utilized it on its tailgate casings. For now, however, Ford's Motion in Limine to Exclude the testimony of Norman Behn is DENIED in part and GRANTED in part.

### c. *Motion for Extension of Time to Disclose Experts*

The Court shall further consider the Plaintiffs' request for an extension of time to disclose additional experts after the parties have had an opportunity to submit responses on the issue. In the meantime, that motion remains UNDER ADVISEMENT.

### *CONCLUSION*

Based on the foregoing, Ford's Motion in Limine to exclude the testimony of Donald Wulpi is GRANTED in part and DENIED in part. Ford's Motion in Limine to exclude the testimony of Norman Behn is GRANTED in part and DENIED in part. Plaintiffs' Motion for Extension of

Time for Disclosure of Expert Testimony remains UNDER ADVISEMENT.

---

8. During the *Daubert* hearing, Plaintiffs' counsel took the position that if Ford stipulates that the nylon was not intended to protect the wires from the moisture, then it has, in effect, stipulated that it made a defective part. This is not so, however. A product is only defective if it is not fit for its intended use and is not in a condition reasonably expected by consumers or users. *See Ind.Code* § 34–20–4–1. Here, if Ford stipulates that the plastic casing was not intended to be used as a protective device to guard the metal cables from moisture, salt spray, etc., then the fact that the plastic casing failed to provide such protection cannot provide the basis for a liability based upon design defect.