**Eartha COLLIER, Plaintiff,**

v.

**BRADLEY UNIVERSITY, a non-profit corporation, Lori Russell–Chapin, and Joan Sattler, Defendant.**

**No. 99–1009.**

United States District Court, C.D. Illinois.

Aug. 31, 2000.

Edward T Stein, Law Offices of Edward T Stein, Chicago, IL, for plaintiffs.

William R Kohlhase, Jennifer Klein Van-deWiele, Miller Hall & Triggs, Peoria, IL, for defendants.

## ORDER

MIHM, District Judge.

This matter is before the Court on Defendants' Motion in Limine. On July 28, 2000, this Court entertained oral arguments from the parties on both Defendants' and Plaintiff's Motions in Limine. The Court has already ruled on all of the issues raised by the parties with the exception of four issues raised by Defendants in their Motion in Limine. Those issues and the Court's resolution thereof are set forth in Part II of this Order.

### I. Factual Background

Plaintiff, Eartha Collier ("Collier"), an African–American, was formerly employed by Defendant, Bradley University ("Bradley" or "the University"). She was hired as an assistant professor in 1995 to teach in the Education Leadership and Human Development Department ("ELH Department"), which is a department in the College of Education and Health Sciences ("the College"). Defendant, Dr. Lori Russell–Chapin ("Russell–Chapin"), was at all relevant times the head of the ELH Department and Collier's mentor. Defendant, Dr. Joan Sattler ("Sattler"), was at all relevant times the Dean of the College.

In or about February of 1998, the annual review committee of the ELH Department and Russell–Chapin recommended that Collier be given a terminal contract for the 1998–1999 academic year. Bradley accepted the recommendation and offered Collier the terminal contract. Collier did not teach during the 1998–1999 academic year.

In the summer of 1998, Collier filed a charge of discrimination with the Equal Employment Opportunity Commission. She subsequently filed a three-count lawsuit in this Court. In Count I, she alleges that Defendants discriminated and retaliated against her in violation of 42 U.S.C. § 1981. The claim of discrimination includes both a claim of disparate treatment and hostile work environment. Counts II and III are brought pursuant to Title VII and solely against the University. Respectively, Collier alleges discrimination (disparate treatment and hostile work environment) and retaliation.

During the course of discovery, Collier retained as an expert witness Dr. Midge Wilson, who is a professor at DePaul University and has her doctorate in social psychology.

This Order follows.

### II. Discussion

The Court has yet to rule on the following issues raised by Defendants in their Motion in Limine.

1. Whether Plaintiff may introduce evidence concerning alleged due process violations by the University;
2. Whether Collier may introduce statistical evidence concerning the percentage of minority student and faculty members.
3. Whether Collier may introduce and/or refer to the publication entitled *Race, Ethnicity, and an American Campus;* and
4. Whether Dr. Midge Wilson may testify as an expert witness.

The Court will address each issue in turn.

### A. Issue 1: Alleged Due Process Violations

■ Collier intends to introduce evidence that she was not afforded during her

evaluations the process set forth by the American Association of University Professors ("AAUP") and that the process she was afforded was out of the ordinary as compared to the process afforded other faculty members.

The Court finds that no witness may testify concerning the AAUP standards in the absence of evidence from which a reasonable trier of fact could conclude that Bradley had either adopted the AAUP standards during Collier's tenure or was required to adopt the standards pursuant to a legislative mandate or contractual obligation. Because Collier has not proffered such evidence, the AAUP standards are irrelevant. As discussed during oral argument, this is not a negligence case in which the industry standard might be relevant, assuming, of course, that the AAUP standards could be considered an "industry standard" among universities. We are dealing with a private university that, absent some legislative mandate or contractual obligation, has every right not to use the AAUP standards of due process.

However, to the extent that Collier intends to introduce evidence that Bradley did not follow its own policies and procedures in its annual review of her, such evidence is fair game. Additionally, Collier may introduce evidence and argue that whatever process she received was different from that received by similarly situated faculty members at Bradley.

## B. Issue 2: Statistical Evidence

■ For statistical evidence to have any meaning, there must be a baseline for comparison. *See, e.g., Kidd v. Illinois State Police,* 167 F.3d 1084, 1101 (7th Cir. 1999). To determine the relevant baseline, one must first determine for what purpose the statistical evidence is being offered. For example, to establish a pattern of discriminatory *hiring,* the relevant comparison would be one between the racial composition of those hired and those who applied who were also qualified for the job.

*See Ibarra v. Martin,* 143 F.3d 286, 291 (7th Cir.1998).

■ In this case, Collier intends to offer evidence that there was only slightly more than a ⅒ of 1% (0.0012) probability of selecting the only two African–American women in a pool of 41 applicants for the positions for which Dr. Collier and Dr. Jackson, who is also African–American, were hired in 1995. Her reason for using this statistic is unique, and possibly compelling. Collier believes that because race accounted for her being hired, it could have just as easily accounted for her contract not being renewed and other alleged acts of harassment or discrimination. According to Collier, professors at Bradley, to include Collier's mentor and department head, Russell–Chapin, were angered that they had to hire black applicants over white applicants and, therefore, targeted Collier from the beginning of her employment with Bradley.

There is a potential problem with this statistical evidence. We do not know of the pool of 41 applicants how many were actually qualified to perform the jobs for which Collier and Dr. Jackson were hired. If there is evidence that the 41 applicants who applied were qualified, then this statistical evidence is admissible. However, in the absence of some agreement of the parties regarding this point or evidence from which a reasonable trier of fact could conclude that the other 39 applicants were qualified for the available positions, this evidence is completely irrelevant because there would be an absence of a proper baseline of comparison. Accordingly, before Collier is allowed to introduce evidence concerning the probability of her and Dr. Jackson being hired, she will have to lay the appropriate foundation.

During oral argument, Dr. Collier's attorney also stated that he intends to introduce evidence concerning the racial make-up of the students at Bradley and the racial make-up of the department or college in which Dr. Collier worked. The Court does not believe the racial make-up

of the students is relevant, and also questions the relevance of the racial make-up of the department or college in which Dr. Collier worked. If she is arguing there were few or no African–Americans in her department and college when she was hired and, therefore, this is indicative of a general race animus on the part of Bradley or the individual Defendants, then the racial make-up of the department or college is irrelevant.

With that said, the racial make-up of Collier's department will necessarily and appropriately be introduced during the trial. It would be inappropriate for this Court to prohibit Dr. Collier or any other witness from testifying that the department in which she worked was predominately mono-racial. However, if such evidence is introduced by Dr. Collier, the Court will give a cautionary instruction to the jury cautioning it not infer from the racial make-up of the ELH Department or College that Bradley had a racial animus against African–American or any other minority faculty.

In summary, if the proper foundation is laid concerning the probability of Collier and Dr. Jackson being hired in the same year, Collier may introduce this evidence and may do so through her expert witness, Dr. Wilson. Although Dr. Wilson is not a statistical expert, she did rely upon a person who was presumably qualified in calculating probabilities. *Cf. Walker*, 208 F.3d at 589 ("Nor do we believe that a leader of a clinical medical team must be qualified as an expert in every individual discipline encompassed by the team ...."). The racial make-up of the students at Bradley is irrelevant. Dr. Collier may introduce evidence of the racial make-up of the College and ELH Department, and if such evidence is introduced, a cautionary instruction shall be given. The parties shall work together on the cautionary instruction.

## C. Issue 3: Race, Ethnicity and an American Campus

■ In the fall of 1991, Bradley University was awarded a grant by the Lilly Endowment to Improve the Campus Climate for Racial and Ethnic Minorities ("Lilly Endowment"). The grant included funding for program development in five areas: a residency program by visiting minority artists and scholars, faculty grants for curriculum development, improvements in the library collections and programs, diversity appreciation sessions, and minority student services. *See Race, Ethnicity, and an American Campus*, Preface at v (1995), *hereinafter Race, Ethnicity*. *Race, Ethnicity* was written by Bradley's Office for Teaching Excellence and Faculty Development as a report on the programs developed in the above areas and for the purpose of providing suggestions to other universities and colleges concerned about the status of minority issues and minority students, faculty, and staff. *See id.*

Defendants have moved to exclude *Race, Ethnicity* from evidence and any reference thereto by Collier or her witnesses. They argue that the book is hearsay and irrelevant and, to the extent the book is otherwise admissible, is inadmissible under Federal Rule of Evidence 403. In her Response to the Motion in Limine, Collier asserts four reasons for admitting the book into evidence: (1) the book is relevant in establishing the workplace culture at Bradley; (2) it demonstrates Defendants' knowledge of the atmosphere of racial problems at Bradley; (3) the evidence of discrimination based on race detailed in the book demonstrates that Defendants had constructive knowledge of discrimination and harassment and failed to prevent it; and (4) certain statements in the book demonstrate that Defendants had knowledge that racial and ethnic minorities faced difficulties on campus and yet failed to address them. (Plt. Resp. at 9–10).

During the August 4, 2000, hearing, the Court directed Collier's counsel to indicate which portions of the book he intended to introduce as evidence. Because of the fa-

cial irrelevance of much the book, the Court was, and still is, concerned about the jury being able to view the entirety of the text, if it is to view any of the text at all. For example, there is a chapter in the book dealing with the propriety of Bradley's athletic team name, "the Braves." *See id.* at 261–82. Collier makes absolutely no attempt to explain how Bradley's mascot and the controversy surrounding it is remotely relevant to whether or not she was the victim of workplace discrimination and/or retaliation. She, however, still contends that the entire book is admissible.

The book is devoted to the issues of diversity and multiculturalism and the need to improve relationships on campus among people with culturally diverse backgrounds. For example, a chapter of the book is devoted to faculty grants and curriculum development. *See id.* at 35–47. In this chapter, the author concluded that more minority and multicultural curriculum are needed at Bradley. Collier contends that "the background of Bradley's lack of multicultural curriculum supports the view that Defendants acted based on racial intent." (Plt. Supp. Mem. at 14). Even assuming the alleged need for more multicultural curriculum were relevant to the issue of whether any of the Defendants discriminated and/or retaliated against Collier, it is readily apparent to the Court from Collier's argument and the citations she makes to the book that the probative value of the book is minimal, at best. Anti-discrimination and retaliation laws do not require that an employer, to include a university, have a healthy multicultural perspective, whatever that might be.

Another portion of the book cited by Collier as relevant to this case is Appendix K, which provides, in pertinent part:

> As part of the evaluation of Bradley's three-year campus climate grant from the Lilly Endowment, a survey of campus attitudes toward racial and ethnic minorities was conducted by the Office for Teaching and Excellence and Faculty Development (OTEFD). As the appended demographic summary indicates, OTEFD attempted to reach all members of the University—students, faculty, staff, and administration.

> The attempt, unfortunately, only very partially succeeded: of a target audience of over 6000, 1104 responded. This low return rate and the fact that the sampling does *not* reflect a "scientific" sampling of the population must limit any conclusions we draw form the survey. We also consider the very low number of returns from self-identified "minorities" (black, asian, native american, and hispanic) as we judge results: only a total of 38 blacks, 3 native americans, 28 asians, and 27 hispanics responded. (Other members of these groups may be included in the totals, but only these numbers identified themselves as members of each group.).

> Even with these limitations, however, a number of striking (although not surprising) trends emerged. Black respondents have the most negative view of the campus climate; hispanics and, to a slightly higher degree, asians responded more positively. White respondents are clearly more sanguine about relations between majority and minority peoples at Bradley than any "minority" group....

> Perhaps just as noticeable as the discrepancy between "majority" (i.e."white") and "minority" perceptions of life at Bradley is the remarkable frequency of white respondents to indicate "neutral" as their response: in 24 of 40 questions, more than 40% of white respondents made "feel neutral" their response. It may be that white respondents don't know enough, don't care a great deal, or are undecided about the questions. It may also be that a larger number of "minority" responses would indicate a similarly neutral response. Nonetheless, if we believe the issues of cultural diversity and equity are significant and if the minority responses are as representative as they appear, then we

must do a better job of informing and convincing Bradley's white community of the issues.

Let me cite a few examples of the discrepancy in the experience of life at Bradley.

1) Over 50% of black respondents believe that the University *does not* make people from all cultures feel welcome; over 65% of whites believe the University does make diverse peoples welcome.

2) Over 70% of both blacks and hispanics agree that Bradley should have more cultural and racial diversity; only 35% of whites agree.

3) Over 85% of blacks would like to see more minority students on campus; only 30% of whites would.

4) 92% of blacks, 77% of hispanics, 53% of asians, but only 36% of whites agree that they would like to see more minority faculty.

5) Are minority students treated fairly & equally? 62% of whites and 56% of asians agree; 58% of blacks *disagree.*

6) Most blacks (57%) disagree that Bradley successfully recruits minority students; very few whites disagree (5.3%).

7) Does the curriculum provide opportunities to read, study, and celebrate students' own cultures? 47% of whites agree; 58% of blacks and 44% of hispanics *disagree.*

8) 63% and 48% of blacks agree that issues of race/ethnicity are only considered in ethnic studies or special courses; only 20% of whites agree.

9) 75% of blacks agree that training programs to increase awareness of other cultures are needed; only 34% of white[s] agree.

10) More than half of black respondents (55%), a third of hispanic respondents, and almost a fourth of asian respondents (24.1%) feel that academic hiring practices do *not* reflect a commitment to building a multicultural environment; only 10.5% of white respondents feel this way.

11) Are minorities adequately represented on policy-making committees? 62.5% of blacks, 31% of asians, and 22.2% of hispanics say no.; most whites "feel neutral" (74.1%).

12) Are we making progress? Does the campus exhibit more cultural and racial diversity than when respondents arrived? 31.7% of blacks, 26.9% of whites, 20.0% of asians, and 18.5% of hispanics say yes. However, most whites (56.8%), asians (53.3%), and hispanics (63.0%) feel neutral on this question. 41.1% of blacks way that we haven't made progress.

These responses clearly indicate a difference in the perceptions of the campus climate for racial and ethnic minorities: black members are not at all optimistic about Bradley's curriculum, hiring and recruiting practices, administrative policies, and campus attitudes; hispanics and asians have mixed responses; whites are the most positive of any group about Bradley's climate for non-whites.

*Race, Ethnicity* at 287–90 (emphasis in original).

According to Collier, this unscientific survey and the conclusions drawn therefrom "inform Bradley that white students, faculty, and staff have perspectives that could ultimately harm minorities on campus." (Plt. Supp. Mem. at 13). Respectfully, this survey does not allow any such conclusion, and Collier will not be allowed to ask the jury to make this inferential leap. This unscientific survey, at most, demonstrates the different perspectives on issues among people of four different cultural backgrounds. It does not even begin to speak to the issue of discrimination in the workplace, but only speaks to issues of diversity and multiculturalism. To the extent this survey is probative to the issues *sub judice,* it is only remotely so.

Collier cites to other portions of the book, all of which are the same or similar to the above quoted material. In short, this book deals with issues of diversity and multiculturalism. While such issues are important, involving the jury in considerations of diversity and multiculturalism as they are set forth in *Race, Ethnicity* and asking the jury to infer either a discriminatory intent or notice of discrimination by Defendants from the book would only serve to interject substantial unfair prejudice into the case and/or substantially confuse the jury and divert its attention from the issues of whether Collier was, in fact, the victim of discrimination, harassment, or retaliation.

Accordingly, the Court finds that the survey responses and evaluation thereof in *Race, Ethnicity* are inadmissible because they are, admittedly, unscientific. With regard to the entire book, the Court finds that it is inadmissible pursuant to Rule 403 because the probative value of the book is substantially outweighed by the danger of unfair prejudice and confusion regarding the issues that are germane to this trial. The propriety of multiculturalism and diversity and Bradley's efforts (or lack thereof) to attain the status of an ideal multicultural and diverse university, whatever that might be, are not on trial in this case, and the Court cannot allow the trier of fact to be under a different impression.

### D. Issue 4: Dr. Wilson's Testimony

Before addressing whether Dr. Wilson will be allowed to testify at trial, the Court addresses Defendants' Motion to Strike. On August 1, 2000, this Court held supplemental oral arguments on the issues that remained from Defendants' Motion in Limine. The Court asked Collier's counsel what portions of Dr. Wilson's report were devoted to the issue of stereotyping since it was not obvious from reading the report, yet it was obvious from Collier's Response to Defendants' Motion in Limine that she intended to use Dr. Wilson as an expert on stereotyping. In her expert report, Dr.

Wilson mentioned "stereotyping" on only one occasion and that was in the concluding paragraph. (Wilson Report at 19). Instead of informing the Court at the hearing what portions of Wilson's report dealt with the issue of stereotyping, Collier's attorney requested leave to first discuss the matter with Dr. Wilson and then specify those portions in a submission to the Court. The Court granted the request and subsequently received from Collier a Supplemental Memorandum in Support of Response to Defendant's Motion in Limine. Attached to the Supplemental Memorandum as Exhibit A was a supplemental expert report from Dr. Wilson.

As opposed to this report directing the Court's attention to those portions of Dr. Wilson's original report that discussed the issue of stereotyping, the supplemental report is devoted to the issue of stereotyping and discusses matters and cites to authorities that are not discussed or cited in her original report. At no time did this Court grant Collier leave to file a new expert report on stereotyping or any other subject. While under Rule 26(e) there is a duty to *supplement* Rule 26(a) disclosures based on information subsequently acquired or a realization that prior disclosures were incomplete or incorrect, Dr. Wilson's supplemental expert report meets neither of these requirements. Instead, it constitutes a belated attempt to add theories to her opinion that were never before identified or discussed in any substantive manner. Collier has failed to explain why the information contained in the supplemental report was not provided in the original report at the time the disclosure of experts was mandated by the Court's Scheduling Order. Accordingly, the Motion to Strike is granted. *See* Fed. R.Civ.P. 37(c)(1).

The Court notes, however, that even the supplemental report, if considered, is of no help to Collier since there is nothing in the supplemental report that cures the fatal defects in Dr. Wilson's expert testimony, which the Court now addresses.

██ The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The *Daubert* Court interpreted this rule to require that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. Accordingly, "as a threshold matter a district court is required to determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir.2000) (citation and quotation marks omitted). "When making these determinations, the district court functions as a gatekeeper whose role is to keep experts within their proper scope, lest apparently scientific testimony carry more weight than it deserves." *Id.* (citation and quotation marks omitted).

██ In her Rule 26(a) report, Dr. Wilson states:

> [I]t is my opinion, based on expertise in the area of race relations that Dr. Eartha Collier experienced race discrimination, racial harassment, and retaliation during her employment at Bradley University, which ultimately resulted in her contract not being renewed. My judgment is based on 1) Dr. Collier's experience as I understood them to be from reading her deposition, 2) the depositions of others related to this case, including but not limited to Dr. Collier's colleagues and administrators at Bradley, 3) the various documents.and exhibits provided to me in this case, and 4) from an interview I conducted with Dr. Collier on January 17, 2000.

(Wilson Report at 2). Dr. Wilson also opined in her report that Collier suffers from emotional distress, possesses "PTSD like symptoms," and that the distress was caused by Defendants. (*Id.* at 19). Dr. Wilson's report is divided into three major categories: (1) documentation of racial discrimination, harassment, and retaliation, (2) violations in academic due process in annual evaluations, and (3) the emotional distress suffered by Collier as a result of Collier's experiences at Bradley. (*Id.* at 2). Defendants seek to bar Dr. Wilson from testifying at trial, arguing that Dr. Wilson's opinions are unreliable and that her testimony would not assist the trier of fact.

In *Smith v. Ford Motor Company, supra*, the Seventh Circuit stated:

> In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching [her] conclusions. . . .
>
> A court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter. Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some scientific method." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir.1999). However, we emphasize that the court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment. *See Daubert*, 509 U.S. at 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that

they generate."); *Walker*, 208 F.3d at 587 (stating that when addressing whether expert testimony is reliable the district court should not consider the "factual underpinnings" of the testimony but should determine whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources ·of information he employed.").

In *Daubert*, the Supreme Court outlined four factors that may be pertinent to a district court's analysis of expert testimony. Those traditional factors are: (1) "whether [the expert's theory] can (and has been tested)"; (2) "whether the theory or technique has been subject to peer review and publication"; (3) "the known or potential rate of error"; and (4) "general acceptance" among "the relevant scientific community." *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. However, as the Supreme Court and Seventh Circuit have repeatedly emphasized, this Rule 702 inquiry is a flexible one and no single factor is either required in the analysis or dispositive as to its outcome. *See, e.g., Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Smith v. Ford Motor Co.*, 215 F.3d at 719.

The parties primarily focus on the methodology used by Dr. Wilson and its acceptance in the relative community of social psychologists. According to Defendants, Dr. Wilson's methodology is flawed because she based her opinion upon review of the documents listed in her report (depositions, Complaint, Answer, exhibits, *etc.*), consultation with Collier's attorney, an interview of Collier, and library research. According to Defendants this methodology is flawed because she did not conduct an interview of any person other than Collier, perform any testing, or make any independent attempt to verify the underlying facts presented to her. In response, Collier contends that Dr. Wilson conducted a content analysis, which is an analysis widely used by social psychologists in discrimination cases. *See, e.g., Butler v. Home Depot*,

*Inc.*, 984 F.Supp. 1257 (N.D.Cal.1997); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1502–03 (M.D.Fla.1991). Moreover, Collier argues that the documents and interviews upon which she relied to reach her conclusions go toward the weight, not the admissibility, of her testimony.

Whatever merit there may be to content analysis being a recognized methodology in the field of social psychology, it is far from clear that Dr. Wilson even knows what methodology she applied in this case to reach her conclusions. During her deposition, the following exchange took place between Defendants' counsel and Dr. Wilson:

Q: Well, how do social psychologists come to—in performing their discipline, reach conclusions?

A: It depends on the methodology that they use.

Q: What methodology would you employ in your field?

A: There is a number of different methodologies. I could spend an hour taking about the methodologies.

There is survey research, there is interview research, there is experimental research, there is all sorts of qualitative research, there is archival research, there is content analysis, there is direct observation, there is indirect observation. We are a multi-method field.

Q: Okay. And did you do any of those things in this case?

A: *No.* I—well, I interviewed Dr. Collier, but the rest of the research I did on this case was my library research, my gathering of empirical studies that supported the kinds of experiences Dr. Collier had and my analysis of what the depositions said, content analysis. *Maybe that's the method I used. I don't label it. I just read it and pulled it together.*

(Wilson Dep. at 200–01) (emphasis added). If Dr. Wilson is unable to specify what type of methodology she employed in this case, it is. impossible for this Court to

evaluate the propriety of that methodology.

Even assuming that she performed content analysis and as a general matter content analysis were an appropriate method among social psychologists, the manner in which she performed this analysis is inherently flawed as evidenced by the following colloquy during her deposition:

Q: In reaching your opinions in this case, you have made determinations that where there is a conflict in the testimony that Eartha Collier is telling the truth and other people are lying?

[Plaintiff's counsel]: I object to that. It is argumentative. The witness has said earlier—has responded to that earlier. I don't think that she is testifying to—that's an ultimate question for the trier of fact to decide who is lying. She is rendering an opinion based upon the evidence that she has read. It is an improper question.[1]

\* \* \* \* \* \*

Q: What's your answer?

A: I agree with him. I—all right. I will say that I didn't always assume that she was telling the truth and other people weren't. You know, I tried to look at the overall picture and consider perspectives of everyone. And my conclusion was based I think on a pretty impartial reading of the depositions.

Q: You considered—when you say perspectives, you mean the deposition testimony?

A: Yes.

Q: And your testimony now is that your opinions and their validity do not depend on the truthfulness of Eartha Collier's testimony?

[Plaintiff's counsel]: Again, the same objective. I mean it is argumentative.[2]

[Defense counsel]: You already gave a speech for her to answer the last one. Let her answer the question.

\* \* \* \* \* \*

A: *I assume that probably 90 percent of what most people say is true and 10 percent is self-serving.* I assume that not only about Eartha, but also about everyone.

And so you are looking for me to say absolutely everything I read I thought was true, I am not going—I am not going to say that, I know human nature too well.

But I believe in all sincerity that I made a good, impartial read of all the depositions and drew my conclusions from them.

\* \* \* \* \* \*

Q: And in doing that, what statements of Eartha Collier did you discredit?

A: I cannot tell you anything off the top of my head that I discredited.

Q: What statements of Lori Russell–Chapin did you discredit?

A: I can't tell you anything that I discredited from her.

Q: What statements of Joan Sattler did you discredit?

A: There is no particular statement in any of the depositions that I could point to and say I discredited. It is more of a *gestalt.* It is an overall reading.

Okay. This person believes these things happened. This person believe this thing happened. There are some inconsistencies here and there. *Probably 90 percent of what this person says is true, probably 10 percent is self-serving.* I said that. That's the way humans operate.

\* \* \* \* \* \*

---

1. The objection is overruled.

2. The objection is overruled.

Q: Did you make credibility determinations in reaching your opinions, yes or no?

A: Yes. I assume most people were credible.

(Wilson Dep. at 202–06).

The Court is perplexed by the 90%/10% gestalt, content analysis methodology applied by Dr. Wilson in reaching her opinions in this case. The Court is not overly concerned with Dr. Wilson having disregarded portions of witnesses' testimony in reaching her conclusions. For example, a psychologist in *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 581 (7th Cir.2000), relied upon the plaintiff's self-reported medical history. The Seventh Circuit noted that this was completely appropriate because medical professionals may reasonably be expected to rely on self-reported history. "In situations in which a medical expert has relied upon a patient's self-reported history, and that history is found to be inaccurate, district courts usually should allow those inaccuracies ... to be explored through cross-examination." *Id.* However, the problem in this case is there is no indication in the record that the 90%/10% gestalt methodology is even accepted among social psychologists as an appropriate methodology. There is absolutely no support, medical or otherwise, for her conclusion that people are truthful 90% of the time and self-serving the other 10%. Absent some type of support among social scientists or some other reliable sources for her unique assumption, the Court finds that the methodology employed by Dr. Wilson is fundamentally flawed.

Moreover, even if the 90%/10% were an acceptable methodology, one would reasonably expect, and furthermore demand, that Dr. Wilson be able to articulate what she credited and discredited in her gestalt approach. Absent Dr. Wilson being able to articulate what testimony she disregarded as "self-serving," her conclusions are impossible to test on cross-examination by Defendants. If a case involved a chemist who conducted an experiment but was unable to articulate what chemicals she used *and* did not use in the experiment, this court does not believe that any district judge, to include the undersigned, would hesitate in barring the chemist from testifying at trial concerning the experiment. Similarly, this Court sees no reason why a social psychologist should be allowed to testify when she discredited 10% of what people said as self-serving while admittedly being unable to articulate exactly (or even approximately) what she discredited. This issue goes beyond the weight of the testimony and directly to the issues of reliability and helpfulness to the jury. Not only is an opinion that someone was the victim of discrimination, harassment, and or retaliation that is based on discrediting 10% of unspecified testimony for no apparent reason unreliable, it is fundamentally unhelpful to the trier of fact. Therefore, for the above-stated reasons, Dr. Wilson will not be able to testify at trial that Collier was the victim of discrimination, harassment, or retaliation at Bradley University.

The Court's conclusion is buttressed by the fact that much of what Dr. Wilson claims was discrimination, harassment, and/or retaliation by Defendants was not, as a matter of law, conduct prohibited under Title VII or § 1981. In Wilson's view, the failure to "accommodate" newly hired minority faculty constitutes race discrimination or "institutional racism." (Wilson Dep. at 113–14). As an example of accommodating newly hired African American faculty, Wilson believes that African American's should be assigned a mentor of the same race. Even assuming there is merit to this philosophy on mentoring African–American faculty members, there is no requirement in the anti-discrimination laws to accommodate a person's race in the manner advocated by Dr. Wilson. She is also of the opinion that Russell–Chapin's alleged failure to go out of her way to make sure that Collier took advantage of a University fellowship also constituted race discrimination. (*Id.* at

130). Again, an employer is not required under the law to go out of its way to ensure an employee succeeds, whether the employee is white or black. Dr. Wilson also views Caucasians failing to make an effort to understand the experiences of African Americans as "racist." (*Id.* at 154). However, neither Title VII nor § 1981 place a duty to make such an effort on an employer or its employees. Dr. Wilson's is also of the opinion that whether or not race discrimination occurs depends on the victim's viewpoint. (*Id.* at 168–69). Admittedly, the subjective viewpoint of an alleged victim of a hostile work environment is relevant to whether a person was subject to such an environment. However, it is clear from reading Dr. Wilson's testimony that her opinion of the probative value of the alleged victim's subjective belief is not limited to hostile work environment claims, but applies to discrimination in general. Moreover, to the extent that her opinion concerning the subjective viewpoint of a victim is actually limited solely to the hostile work environment claim asserted by Collier, it is fundamentally unhelpful to the jury since Collier will be able to tell the jury when she testifies how Defendants alleged conduct made her feel. She does not need the imprimatur of an expert witness to express to the jury how she felt when she worked for Bradley or how she perceived Defendants' conduct. More importantly, it would only be duplicative and improper under Rule 403 for the jury to hear from Collier as well as Dr. Wilson how Collier subjectively perceived the treatment she allegedly received from Defendants.

Collier argues that the jury need not accept what Dr. Wilson believes is race discrimination and that Defendants will have ample opportunity on cross-examination and closing argument to indicate what is not actionable in this case. Respectfully, this argument misses the mark. It is this Court's role to instruct the jury on the applicable law. Perhaps an argument could be made that this Court's instructions to the jury would cure any misstatement by Dr. Wilson as to what is or is not discrimination, harassment or retaliation. However, when, as in this case, an expert's opinions are so rife with misstatements of the law, even the best set of jury instructions would be unable to act as an effective cure. Moreover, when, as in this case, an expert's opinion of whether the alleged conduct constituted discrimination, harassment, or retaliation is based, in large part, on a misunderstanding of what, as a matter of law, constitutes such conduct, the opinion is of no assistance to the trier of fact.

The Court now turns to the issue of whether Dr. Wilson may testify concerning her psychological evaluation of Collier. Defendants argue that Dr. Wilson has used an improper methodology in assessing Collier's emotional state. Dr. Wilson met with Collier on one occasion and evaluated her emotional state after "ask[ing] her from 1 to 100, with 100 being her best emotional state and 0 being the lowest to evaluate both her time at Bradley and since then." During her deposition, the following exchange took place between Dr. Wilson and Defendants' counsel concerning this methodology:

Q. Did you administer any psychological tests to Dr. Collier?

A. I did not.

Q. This asking her to use a scale from 1 to 100, that's not a psychological test?

A. No.

Q. Is that anything that is recognized as a technique in the field of psychology?

A. No. Not a technique with a label on it. It is certainly not uncommon for a therapist to use a scale like that to assess emotional happiness functioning, but it doesn't have a standard name technique.

Q. You essentially just asked her to quantify how she felt?

A. Yes.

Q. Are there psychological tests that you could have administered to Dr. Collier to assess her emotional state?

A. There are tests that maybe other people who had more expertise in assessment could have administered. I personally wouldn't have felt comfortable administering those kind of tests.

Q. But nevertheless, you are saying that you are assessing her emotional state?

A. I included a section in my report on that. It is my impression of her when I met with her.

Q. *But as a psychologist, you don't have sufficient expertise to administer the tests that psychologists would use to assess her emotional state?*

A. I haven't administered tests like that in a long, long time, so I just would feel uncomfortable doing that. *It wasn't a full-blown assessment of her, it was a thumbnail sketch impression of her, based on a single interview.*

(Wilson Dep. at 189–191) (emphasis added). This testimony demonstrates that she did not use any recognized test or method to evaluate whether Collier has post traumatic stress syndrome or any other emotional problem. In fact, she stated that she felt uncomfortable administering the types of tests that psychologists would use in evaluating a person's emotional state. While it is true that "medical professionals reasonably may be expected to rely on self-reported patient histories," the critical issue is whether a proper methodology was employed in relying on such accounts. *Walker*, 208 F.3d. at 586–87. The Court finds that Dr. Wilson's methodology was flawed.

To any extent that it is proper to diagnose post-traumatic stress syndrome or other emotional problems by using only the 1 to 100 scale method, Dr. Wilson should not be able to testify concerning her conclusions since, at best, she can only provide a "thumb nail sketch" based on something that was not a "full blown assessment." A "thumb nail sketch" and less than a full assessment do not meet minimum standards for the work of an expert or assist the trier of fact.

Lastly, the Court addresses whether Dr. Wilson will be able to testify concerning alleged violations of Collier's right to the due process during the evaluation process. Before doing so, the Court notes that this case does not involve a Fourteenth Amendment due process claim, nor could it since Bradley is a private institution and the individual Defendants are not state actors.

Defendants argue that Dr. Wilson does not possess adequate qualifications to testify to the alleged due process violations that occurred in the annual review process at Bradley. Collier, on the other hand, argues that although Dr. Wilson's expertise as a social psychologist are not germane to her due process opinion, her familiarity with the practices and traditions of higher education provide her with a familiarity with due process procedures. Collier points out that Dr. Wilson has participated as DePaul University's representative on the Faculty Advisory Committee to the Illinois Board of Higher Education and has acted as the acting director and director of women's studies at DePaul University. While this may be true, Collier fails to explain how Dr. Wilson's familiarity with or expertise in understanding DePaul University's procedures, the procedures of academia in general, and DePaul's women's studies are remotely germane to ability to express an opinion on the procedures at Bradley University and whether such procedures were followed. Accordingly, she will not be allowed to offer an opinion as to whether the process afforded Collier was out of the ordinary since her comparison of Bradley to DePaul University or academia in general is wholly irrelevant to this case and would only serve to substantially confuse the trier of fact.

The Court acknowledges, however, that Dr. Wilson's opinion concerning the issue of due process is not limited to whether

Collier actually received due process. She also opines that Defendants applied a double standard to Collier. In her report, Dr. Wilson states:

> The double standard in the treatment of Dr. Collier can only be explained by race. Dr. Ryback, a White male, said that he did not have to submit additional documents or materials beyond his Activity Report to the Annual Review Committee when he was being evaluated at that stage of his career, and both Dr. Lyman ... and Dr. Choi ... said that there was no mandate that a person has to be published within their first year. Yet, additional burdens and expectations were placed on Dr. Collier.

(Wilson Report at 17).

Perhaps such an opinion draws upon her expertise as a social psychologist. However, even if her opinion is derived, at least in part, from her expertise in social psychology, the Court questions whether such testimony would be helpful to the trier of fact since juries are, not unlike social psychologists, quite able to identify a double standard when presented with one in the evidence. Nevertheless, the Court is also aware of the Seventh Circuit's admonishment in *United States v. Hall,* 93 F.3d 1337, 1344 (7th Cir.1996), where the court stated, "[T]he district court is *not compelled* to exclude all expert testimony that may in some way overlap with matters within the jury's experience." (Emphasis added). However, "If the proffered testimony duplicates the jury's knowledge, Rule 403 might counsel exclusion of the expert testimony to avoid the risk of unduly influencing the jury." *Id.*

In this case, the Court finds that Dr. Wilson's ability to observe double treatment in the application of due process (or lack thereof) to Collier as compared to similarly situated Caucasian faculty members only duplicates what a jury is fully capable of doing without the aid of a social psychologist. Moreover, the Court presumes that Collier will introduce into evidence that certain faculty members received treatment from Defendants during the annual review process that was different than the treatment she received during her annual review in the fall of 1997 and the winter of 1998. To allow Dr. Wilson to restate this evidence and then add her conclusion that this the alleged different treatment can only be accounted for by race would be equally unhelpful to the trier of fact. Accordingly, the Court finds that Rule 403 counsels the exclusion of Dr. Wilson's double standard, due process opinion.

In summary, the Court finds that Dr. Wilson will not be allowed to testify at trial, with the exception that she may be used by Collier to introduce the statistical evidence concerning the probability of Collier and Dr. Jackson being hired at the same time. Her ability to so testify is, as previously stated, conditioned on the proper foundation being laid for such evidence.

### Conclusion

For the foregoing reasons: (1) Collier may introduce evidence concerning the due process she was provided (or not provided) by Bradley University but may not introduce evidence concerning or refer to the AAUP standards; (2) she may introduce evidence concerning the probability of her and Dr. Jackson being hired at the same time, provided the proper foundation is laid; (3) she may not introduce any portion of *Race, Ethnicity* or refer to it during her opening statement or closing argument; (4) she may not offer Dr. Wilson as a witness in this case with the exception of offering her for the purpose of introducing the statistical evidence; and (5) the Motion to Strike [# 38–1] is GRANTED.